BURNS, Plaintiff in error, vs. THE STATE, Defendant in error.

*November 21, 1910—March 14, 1911.*

*Criminal law and practice: Jurors: Competency: Challenge: Review of decision: Instructions to jury: Undisputed facts: Bailment: Larceny by bailee: Misconduct of jury: Reading newspapers: Witnesses: Competency: Insane persons.*

1. A juror in a criminal case is not necessarily incompetent merely because he has an impression or opinion as to the merits of the case, formed from reading newspaper accounts and from other hearsay information.

2. On a challenge in such case the question of competency is one of fact to be determined by the trial court in view of all the evidence and the mental characteristics of the juror appearing from his examination.

3. A decision of the trial court holding such a juror competent will not be held erroneous unless clearly shown to be wrong or an abuse of discretion; but, generally speaking, the practice is to be commended which excuses the juror in such a case.

4. A court may in a criminal case, as in any other, instruct the jury respecting facts established by the evidence beyond any room for reasonable controversy, and when such evidentiary facts exist establishing beyond any room for reasonable controversy an essential of any ultimate conclusion sought, it is not a harmful error, if error at all, to treat such essential as having been proven.

5. The possession of a bailee and his duty to account for the property need not be based upon a contract *inter partes*, but may result from the operation of law.

6. A constable who, upon taking an insane man in charge after a pursuit, received from one of the pursuers a roll of money which had been thrown away by the man in his flight, became

thereby a bailee of such money; and where such facts were un-
disputed upon the trial of the constable for larceny of the money
under sec. 4415, Stats. (1898), the court properly instructed the
jury that if the accused converted any of such money to his own
use he did so as bailee.

7. Sec. 4415, Stats. (1898), abolishes the distinction between con-
version by a bailee of an entire thing and the unlawful break-
ing of a package and conversion of part or all of the contents,
each of such acts differing from ordinary larcenies by the ab-
sence of the element of trespass in gaining original possession;
so that where the evidence shows the breaking of a package of
money and the extracting therefrom of a part of the contents,
acquittal of the accused under a count charging larceny of the
money is not inconsistent with his conviction, under another
count, of the statutory offense of larceny by a bailee.

8. Misconduct of the jury, after the panel had retired, in getting
possession of a newspaper and reading therein an account of
their deliberations, and misconduct of the officer in charge in
permitting the jury to get possession of such paper, do not call
for a reversal of the judgment unless it appears to this court
that, had the improper conduct not occurred, the result might,
within reasonable probabilities, have been different.

9. Such misconduct, as well as the misconduct of the newspapers in
publishing the secrets of the jury room, are highly reprehen-
sible and should be rebuked or punished by trial courts.

10. A person is not necessarily incompetent to testify because of im-
paired mental condition at the time of the occurrences in ques-
tion. Whether he is so mentally infirm as not to be entitled to
testify at all is a question for the trial court, and its decision
in favor of receiving the testimony for what it is worth cannot
be disturbed unless manifestly wrong, as where the infirmity is
total or such as to render the person wholly unconscious of the
obligations of an oath.

ERROR to review a judgment of the circuit court for Racine
county: E. B. BELDEN, Circuit Judge. *Affirmed.*

The accused was duly informed against in two counts,
*first,* as having committed the crime of larceny of. $400 in
lawful money; *second,* as having, while in the possession of
$400 of lawful money as bailee, feloniously converted the
same to his own use. The owner of the money was alleged,
in each count, to be Paul Adamsky.

Such proceedings were had that the accused was, in due form, found guilty on the second count and not guilty on the first. Judgment was rendered accordingly.

The evidence proved, or tended to prove, this situation: Adamsky, who was somewhat insane, May 6, 1909, had upon his person $602.75 in money, mostly in $5, $10, and $20 bills which he had drawn from the bank at Two Rivers on that day. Five hundred dollars of the money was in a package wrapped in a paper as he received the same from the bank. He stayed at Two Rivers till the evening of the next day, spending the night at home with his family. He did not count his money after he left the bank. On such evening he went to Manitowoc on a street car. He remained there through the night in the depot, and then left by railroad train for Indiana. He was suffering from a delusion that some one was trying to get his money. He went about in his half-crazed condition for some three days when he brought up at Corliss on a railroad train which came in from the south. As the train drew in to the station he jumped out of the car window and fled easterly toward an intersection of the Chicago, Milwaukee & St. Paul track with the Chicago & Northwestern track, about a mile east of Corliss where there was a switch and signal tower. Several, including one Kasdorf, pursued him. Before reaching the tower he made a motion as if taking something from his coat pocket and throwing it away. Upon arriving at the tower he drew his revolver on the tower man, but without discharging it put it up and fled toward Milwaukee on the Chicago & Northwestern track. The tower man with a track bicycle accompanied by Kasdorf followed. Soon they saw Adamsky lay something down on the track, which proved to be a roll of money. Kasdorf possessed himself of the roll and they delayed further pursuit for a moment while he partially counted the money. Before finishing they again started in pursuit of Adamsky who they had concluded was insane. This part of the pursuit was

made on foot and away from the track, the tower man being in the lead. He finally came up with Adamsky and was soon joined by Kasdorf. The latter asked Adamsky if the money was his. Adamsky replied that he did not want it. *Thomas Burns,* a constable, and others who had pursued the fleeing man from Corliss, came up, whereupon Kasdorf handed the package to *Burns* in the condition it was in when he stopped counting, as aforesaid. *Burns* put the roll in his pocket. He then took Adamsky in charge and, in due course, placed him in custody of the sheriff of Racine county at the city of Racine, asking the sheriff to telephone Adamsky's wife that upon her coming to Corliss he would turn over her husband's belongings. He then returned to Corliss taking with him the roll of money and things he had obtained from Adamsky's person. He said at the jail that he had obtained $15 or $17 of Adamsky's money. He did not know himself then the amount as he had not fully counted the money. Later he made as an excuse for understating the amount that he did not care to have people know how much money he had on his person or about his premises. He searched the next day along the track for money reported to have been thrown away by Adamsky, other than the package, but did not find any. Several days after he received the roll of money, the sheriff, because of hearing there was more than he heard the accused reported, visited him in respect to the matter. On this occasion *Burns* delivered to the sheriff $200, obtaining it from the barn, as all Adamsky's money which had come to his possession. He claimed that he counted the money upon reaching home after delivering Adamsky to the sheriff; that the bills were wrapped with some pasteboard in a form to disguise the amount; that they were wet; that he spread them on a girder in the barn to dry, and that before retiring for the night he went thereto, gathered up the bills, put them in a glass milk jar, threw it in the manger and covered it up with hay, where it remained, as he said, till he sought therefor to

make the delivery to the sheriff. He accounted for the peculiar way of safeguarding the money to have been adopted to prevent the bills being carried off or injured by rats or mice. In due time Mr. Knoblock was appointed guardian for Adamsky and demanded of *Burns* possession of the balance of the money. *Burns* denied having any more. Thereupon this action was commenced and prosecuted with the result before indicated.

For the plaintiff in error there was a brief by *Gittins & Burgess* and *Wallace Ingalls,* and a separate brief by *Wm. E. Lee,* and oral argument by *Mr. Ingalls* and *Mr. Lee.*

For the defendant in error there was a brief by the *Attorney General, A. C. Titus,* assistant attorney general, and *Fulton Thompson,* district attorney, and oral argument by *Mr. Titus* and *Mr. Thompson.*

The following opinion was filed December 6, 1910:

MARSHALL, J. Serious complaint is made because the trial court overruled a challenge for favor of one òf the jurors, he having testified, upon the *voir dire,* of having formed an opinion on the merits of the case, about the time of the occurrence in question, from what he had heard, including some things said by the guardian of Adamsky; that it was a mere impression, one from which he would not say the accused was guilty, and which, though it remained in his mind, would not influence him in rendering a verdict on the evidence. The examination of the juror was quite searching and indicated that he was a business man of more than ordinary capability, without any personal acquaintance with the accused, or with the person whose money the latter was charged with having taken, without any interest in the result, more than that of citizens in general, and without any personal feeling for or against the accused.

The error assigned in respect to the foregoing is ruled in favor of the state by *Baker v. State,* 88 Wis. 140, 59 N. W.

570.   It was there held, and is here affirmed, that a juror is not necessarily incompetent simply because of his having an impression or opinion respecting the merits of the case, formed from reading newspaper accounts and from other hearsay information; that in case of a challenge, as in this case, the issue presented is one of fact to be determined with reference to the evidence of the juror, his general character-istics as appears thereby, and impressions upon the court cre-ated by the opportunity for seeing him and witnessing and participating in his examination; that the other evidentiary matters referred to may so neutralize his mere statement of having formed an opinion or impression which will take some evidence to remove, that a finding that he satisfies the consti-tutional call for impartiality cannot be disturbed on appeal as manifestly against the clear preponderance of the evidence.

The doctrine of *Baker v. State, supra,* has support, and condemnation as well, in other jurisdictions.   It is believed there is progressive legal thought in its favor.   Some courts hold that if a juror has an impression or opinion as to the merits of a case which will take evidence to remove, he is legally incompetent to act; that however firmly and consci-entiously he may believe he can act impartially in the matter, it does not cure the infirmity, for the court, in deference to the constitutional right to an impartial jury, will not permit a litigating party, without his consent, to take the chances of the juror being wrong, much less compel him to.   But many other jurisdictions, in harmony with *Baker v. State,* hold that, notwithstanding the mental condition suggested,—in the absence of any evidence showing therewith, satisfactorily, the opinion or impression of the juror to be something more than such as is commonly created in the minds of intelligent people from reading and hearing the news from day to day, an opinion that amounts to real substantial prejudice,—in-competency does not exist, necessarily, as a matter of law, but depends upon the trial judge's determination of fact in

view of all the evidence and mental characteristics of the juror as disclosed by his presence in court and manner of testifying. The finding in that regard, in many jurisdictions, is classed the same as any other of fact by a trial court, as regards requirements to disturb it. This court and some others have gone somewhat further, as indicated in this language from *Reynolds v. U. S.* 98 U. S. 145, 156:

"No less stringent rules should be applied by the reviewing court in such a case than those which govern in the consideration of motions for new trial because the verdict is against the evidence. It must be made clearly to appear that upon the evidence the court ought to have found the juror had formed such an opinion that he could not in law be deemed impartial. The case must be one in which it is manifest the law left nothing to the 'conscience or discretion' of the court."

The quoted language was referred to with approval in the *Baker Case* and voices the rule in this state. In view of that we are unable to overrule the decision of the trial court, though the decision below might well have been the other way.

Great care should be exercised in a criminal prosecution to preserve to the accused his constitutional right to an impartial jury and a fair trial. Ill-advised impatience with the failures to convict, and delays and expense in criminal prosecutions, should not be allowed to overturn or invade the fundamental safeguards of personal and property rights. Notwithstanding the decision in the instance before us, which we feel bound to make in harmony with the settled judicial policy of the state, we have no hesitancy in saying that, generally speaking, trial administration is to be commended rather than complained of, which excuses a juror upon his testifying, on the *voir dire*, that he has heard and read about the case and therefrom formed an opinion on the merits thereof, which persists with him and will persist till removed by evidence; notwithstanding he may testify that, in his opin-

ion, he can act impartially between the parties upon hearing the evidence. Doubtless circumstances may alter cases as they do in most situations.

Error is assigned because the court instructed the jury to the effect that, if the accused converted to his own use any of Adamsky's money, he did so as bailee. It is suggested that the court should have defined the term "bailee," as used in the statute, and left it to the jury to find the fact as to whether the circumstances satisfied such statute or not.

A court may properly instruct a jury in a criminal case, as well as any other, respecting any fact, or facts, established by the evidence beyond any room for reasonable controversy, and when such evidentiary facts exist establishing, beyond any room for reasonable controversy, an essential of any ultimate conclusion sought, it is not harmful error, if error at all, to treat such essential as having been proven, as the court here did in saying that the accused was a bailee of whatever of Adamsky's money came to his possession.

It seems to be thought that a bailment was not established by the evidence because some sort of contract *inter partes* was essential thereto. No particular ceremony or actual meeting of minds is necessary to the creation of a bailment. If one, without the trespass which characterizes ordinary larceny, comes into possession of any personalty of another and is in duty bound to exercise some degree of care to preserve and restore the thing to such other or to some person for that other, or otherwise account for the property as that of such other, according to circumstances,—he is a bailee. It is the element of lawful possession, however created, and duty to account for the thing as the property of another, that creates the bailment, regardless of whether such possession is based on contract in the ordinary sense or not.

It is said, generally, in the books, that a bailment is created by delivery of the personalty to one person by another to be dealt with *in specie* as the property of such other person

under a contract, express or implied, but the word "contract" is used in a broad sense. The mutuality essential to the contractual feature may be created by operation of law as well as by the acts of the parties with intention to contract.

So it makes no difference whether the thing be intrusted to a person by the owner, or another, or by some one for the owner or by the law to the same end. Taking possession without present intent to appropriate raises all the contractual elements essential to a bailment. So the person who *bona fide* recovers the property of another which has been lost, or irresponsibly cast away by an insane man, as in this case, is a bailee as much as if the same property were intrusted to such person by contract *inter partes*. In the latter case the contract creates the duty. In the former the law creates it. Such a situation is to be distinguished from that where one knowingly receives money paid him by mistake and fraudulently retains it. There the element of *bona fide* possession may be said not to exist and so the duty accompanied by such possession essential to a bailment not to have been created. *Fulcher v. State,* 32 Tex. Crim. 621, 25 S. W. 625. We refer to that case by way of illustration, not by way of approval. The logic of it may not be strictly correct.

The finder of property who voluntarily *bona fide* takes it into his possession, immediately, thereupon, has imposed upon him by law the duties of a depositary, the mildest type, as regards degree of duty, of bailee. Story, Bailments, §§ 86, 87; Edwards, Bailments (3d ed.) § 18; Paine, Bailments, § 24.

So the finder here of the cast-away money was clearly a bailee, and when his duties were voluntarily assumed by the accused he became such, and as there was no controversy in respect to such finding and assumption, the court's reference to the matter was proper.

The next suggestion in behalf of plaintiff in error is that, if the accused was guilty of any offense, it was that of having

broken the package and extracted therefrom part of the contents for the purpose of appropriating it to his own use, and executed such purpose, thus committing the offense of larceny, not of conversion by a bailee. It is a sufficient answer thereto that the purpose of the statute, sec. 4415, Stats. (1898), was to abolish the distinction between conversion by a bailee of an entire thing, as a quantity of property in a package of some kind, and the unlawful breaking of the package and conversion of part or all of the contents,—whether preceded by the element of breaking bulk with intent to permanently deprive the owner of the thing appropriated or not,—making the latter a statutory class of larcenies, differing only from ordinary larcenies, by absence in the former of the element of trespass in gaining original possession, which is essential to the latter. *Topolewski v. State,* 130 Wis. 244, 109 N. W. 1037. The meaning of the statute, as indicated, seems very plain:

"Whoever being a bailee of any chattel, money or valuable security shall fraudulently take or fraudulently convert the same to his own use or to the use of any person other than the owner thereof, although he shall not break bulk or otherwise determine the bailment, shall be guilty of larceny. . . ." Sec. 4415, Stats. (1898).

It follows that the acquittal of the accused of the offense of larceny is not inconsistent with his conviction of the statute offense of larceny as bailee.

Error is assigned because of the misconduct of a juror after the panel had retired to deliberate upon their verdict, and misconduct of the officer in charge of the jury. Such misconduct consisted in the former, while the latter were in his charge, and absent from their room at the supper hour, permitting a paper to be possessed by them by which they learned that the conditions of their deliberations were known to the public, and particularly the fact that one juror was persisting against the opinions of his fellows that the accused

was not guilty. Though the conduct of the officer and the jury as well, and the newspaper too, are reprehensible to a high degree, we are unable to reach a conclusion that, had the improper conduct not occurred, the result might, within reasonable probabilities, have been different. Therefore, under the uniform course of our administration and in harmony with the letter and spirit of sec. 2829 of the written law, the misconduct does not call for a reversal.

Notwithstanding the result as to the last assignment of error treated, we are constrained to severely condemn such conduct as the officer and jury were guilty of, and condemn the abuse of freedom of the press in publishing the secrets of the jury room while the case was there being considered. The press is accorded great freedom and constitutional protection, but it should not be forgotten that it is responsible morally and legally for abuse of that right. It is of great importance to the public welfare that such right should be kept inviolate, but of equal importance that its abuses should be prevented so far as practicable and otherwise punished both by legal remedies and by condemnation at the bar of public opinion.

Judicial proceedings, in a case which the law requires to be conducted in secret for the proper administration of justice, should never be, while the case is on trial, given publicity by the press. It is not infrequent that proceedings in courts of England in an important criminal case, are highly commended by the press of this country and comparison with procedure in the latter unjustly made unfavorable thereto, without appreciating that the very things which attract the favorable mention, are promoted by restrictions upon personal liberty which do not exist here at all, or are sparingly enforced. Such an occurrence during an important criminal trial after retirement of the jury to deliberate upon their verdict, as publication in a newspaper of the secrets of the jury room, would, in the mother country, be visited by prompt and severe punishment as contempt of court. That precedents of

like treatment of offenders may be found in the decisions of
courts of this country, is well illustrated by *State v. Howell,*
80 Conn. 668, 69 Atl. 1057. Here the duty to abstain from
such abuses is just as great as elsewhere. Here the sense of
duty incident to good citizenship and public condemnation
for such abuses ought to be sufficient to prevent such occur-
rences. Moreover, trial courts should be alive to the import-
ance of protecting jurors from such interference during the
course of a trial, particularly after their retirement to delib-
erate upon their verdict, in important criminal cases.

The best administration requires that all avenues of com-
munication between the jury and others, except the officer in
charge and the court in the presence of attorneys for the re-
spective parties, should be closed as effectually as possible and
all violations of duty in that respect by jurors and officers
and others should be severely rebuked or punished according
to circumstances. The inadvertence which permits jurors,
after having retired for such deliberation, to leave the jury
room under such circumstances as to get into communication
with others and read the newspapers, should be carefully
avoided. This is but reiterating what has heretofore been
said by this court on several occasions. *Hempton v. State,*
111 Wis. 127, 86 N. W. 596; *Oborn v. State,* 143 Wis. 249,
126 N. W. 737.

We do not overlook the complaint that Adamsky was per-
mitted to testify notwithstanding his impaired mental con-
dition, particularly at the time of the occurrences in question.
A person is not necessarily incompetent to testify because of
such impairment. Whether he is so infirm by reason of in-
sanity, or otherwise, as not to be entitled to testify at all, is
generally in the field of competency. Therefore the decision
of the trial court in favor of receiving the evidence for what
it is worth, cannot be disturbed unless manifestly wrong.
Ordinarily such infirmity goes to the weight of the witness's
evidence, not to competency to testify, unless the impairment

is substantially total or such as to render the person wholly unconscious of the obligations of an oath. Best, Evidence (10th ed.) §§ 148, 150; *Cannady v. Lynch,* 27 Minn. 435, 8 N. W. 164.

The foregoing covers all the complaints on behalf of the accused which require special attention.

*By the Court.*—The judgment is affirmed.

A motion for a rehearing was denied March 14, 1911.