Xuebiao YAO, Plaintiff-Respondent,†

v.

Edwin CHAPMAN and Richard Moss,
Defendants-Appellants.

Court of Appeals

*No. 2004AP1971. Submitted on briefs June 8, 2005.
—Decided August 31, 2005.*

2005 WI App 200

(Also reported in 705 N.W.2d 272.)

† Petition to review denied 12-14-05.

446

447

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Peggy A. Lautenschlager*, attorney general, and *James McCambridge*, assistant attorney general.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James A. Olson*, and *Marsha M. Mansfield*, of *Lawton & Cates, S.C.*, of Madison.

Before Anderson, P.J., Brown and Nettesheim, JJ.

¶ 1. NETTESHEIM, J. Professors Edwin Chapman and Richard Moss (the professors) of the University of Wisconsin-Madison (UW) Department of Physiology (Department) appeal from a monetary judgment in favor of Dr. Xuebiao Yao, a former researcher in the Department. The professors contend the trial court erred when it determined that they had a ministerial duty to safeguard Dr. Yao's cell lines due to a gratuitous bailment under an implied contract and when the court failed to dismiss a separate breach of contract claim.

¶ 2. We agree with the trial court that a gratuitous bailment was created, and that the professors

were negligent under the bailment. We disagree, however, with the court's rulings that the bailment was created pursuant to an implied contract and that the professors' duties under the gratuitous bailment were ministerial in nature thus depriving them of their public officer immunity. Therefore, we reverse the judgment.

## BACKGROUND

¶ 3. The facts, while lengthy, essentially are undisputed. Dr. Yao is from the People's Republic of China. He received his M.D. there in 1985 and came to the United States in 1990 to study at the University of California-Irvine. In 1995, he earned his Ph.D. in molecular and cellular biology from the University of California-Berkeley, after which he began doing post-doctoral work at the University of California-San Diego under Dr. Don Cleveland. While there, he developed a line of monoclonal antibody cells called "hybridoma cells." A hybridoma cell is a type of hybrid cancer cell that results from an immune reaction in mice exposed to proteins implicated in colon cancer. A part of the cell lines' value lies in the fact that they form the foundation for research that builds on itself year after year. Dr. Yao's unique cell lines held potential for use in the study of the causes and treatment of colon cancer.

¶ 4. Dr. Yao's research caught the attention of the UW, which began recruiting him in 1997. In 1998 he accepted the UW's offer of a tenure-track assistant professorship in the Department with a three-year contract. Dr. Cleveland permitted Dr. Yao to take the cell stock—over 600 vials—with him when he relocated to the UW-Madison.

¶ 5. Using start-up funds allocated to him by the UW, Dr. Yao purchased a liquid nitrogen tank to be used

for long-term storage of his cell lines. The cells, kept in vials with a preservative, must be maintained at very cold temperatures, as the cells cannot survive more than a few hours at room temperature. Liquid nitrogen is a desirable refrigerant because it affords the cold temperatures essential to long-term preservation of valuable cell lines without the risk inherent in electric refrigeration. It must be replenished at least every 138 days, however, due to gradual evaporation. Only Dr. Yao and one of his students, Yun Zheng, had use of the liquid nitrogen tank and personally maintained the tank until December 10, 1998.

¶ 6. During Dr. Yao's first year at UW, his cell lines enabled him to secure several outside grants totaling over $1 million. At least two of the grants, one from the National Institutes of Health (NIH) and another from the American Cancer Society, depended upon the availability of his cell lines.

¶ 7. In December 1998, Chapman accused Dr. Yao of sabotaging his research efforts by destroying the work of one of Chapman's graduate students. After an investigation, Dr. Yao was suspended.[1] On December 10, 1998, Moss barred Dr. Yao from any further access to the lab unless accompanied by Moss or one of his designees. Dr. Yao's cell stock was still being maintained in the liquid nitrogen tank at the time of his suspension. Dr. Yao arranged to move the cell stock to another laboratory on campus, but a UW official refused to permit him to do so.

¶ 8. Dr. Yao also was barred from communicating with anyone at the University. Accordingly, Dr. Yao's

---

[1] Dr. Yao ultimately was terminated from his position in December 2002 as a result of the tampering allegations. This court affirmed his termination. *Yao v. Board of Regents*, 2002 WI App 175, ¶ 1, 256 Wis. 2d 941, 649 N.W.2d 356.

453

attorney, Hal Harlowe, secured assurances from John Dowling, the UW's attorney, that Moss would protect and properly store Dr. Yao's cell lines. Harlowe testified at trial that he did not know who specifically would be responsible for replenishing the liquid nitrogen or whether the tank itself would be locked. He further testified that while he had only a "general" rather than a "detailed" understanding with Dowling of the procedure by which the materials would be maintained, he nonetheless believed there was a contractual relationship with the UW regarding the cells. The consideration for the contract, according to Harlowe, was an agreement—one not "ever explicitly discussed" with Dowling, however—that Dr. Yao would not seek an injunction to force the UW to allow him access to the cells.

¶ 9. Under the general arrangement for safeguarding the cell lines, Dr. Yao was permitted to have Zheng, his former student, replenish the liquid nitrogen. Both the lab and the storage tank were kept locked. Moss held the only key to the lab. To gain entrance to the lab, Zheng would have to contact either Moss or his designee who then would accompany Zheng to the lab and unlock the door for him. Zheng then would retrieve the tank key from a storage closet, unlock the tank, replenish the liquid nitrogen and relock the tank. This pattern worked smoothly for about two years.

¶ 10. On December 7, 2000, Moss accompanied Dr. Yao to the laboratory so that Dr. Yao could retrieve some of his research materials to take to the University of California-Berkeley, which had agreed to let him use laboratory space. The lab was locked as it always had been, but Dr. Yao noticed that the padlock on the cover of the storage tank was missing. Moss told Dr. Yao that the tank key had been lost, so he had had the lock cut off. He also told Dr. Yao that he would have the lock

replaced. If the tank cover is properly placed, however, a lock is not required to prevent evaporation. After retrieving a portion of his stock, Dr. Yao replaced the cover on the tank, noting that it contained enough liquid nitrogen in it to last at least sixty more days.

¶ 11. Fifty days later, on January 26, 2001, Dr. Yao returned to collect the remainder of his stored research material from the liquid nitrogen tank. Upon opening the tank, he found that it contained no liquid nitrogen and was not refrigerating his samples. Instead, the vials containing hundreds of different cell lines were in an aqueous solution at room temperature. He also noticed the missing tank key at the bottom of the tank.

¶ 12. In addition, Dr. Yao noticed in the tank a container with three tubes of cells dated "12/20/2000." The container was marked "Chapman." Chapman was the Department professor who two years earlier had accused Dr. Yao of tampering with his experiments. Dr. Yao was "shocked" and "surprised" because he was unaware that anyone other than Moss had access to the laboratory. He later learned that sometime in the year 2000, Moss had given Chapman permission and a key to use Dr. Yao's former laboratory space. Chapman, in turn, gave a key to Cynthia Earles-Ochsner, a postdoctoral student working under Chapman's supervision. In late December 2000, Earles-Ochsner decided on her own to put some of her research materials in the same liquid nitrogen tank with Dr. Yao's cell stock because that tank was more conveniently located than one she had been told she could use in another lab.

¶ 13. At her deposition, Earles-Ochsner described verbally and through a sketch how she had secured the tank by turning the lid to the right. However, she testified at the trial that her deposition testimony had been incorrect and that in fact she had fastened the lid

by securing it in a totally different manner. Also at trial, Earles-Ochsner testified about placing her cell samples in the liquid nitrogen tank. She said she remembered thinking that she "had not a lot of experience with liquid nitrogen tanks," and that, while it was not dry, "it probably needed more liquid nitrogen."

¶ 14. A UW publication entitled "Chemical Safety and Disposal Guide" (Guide) incorporates various Occupational Safety and Health Administration (OSHA) laws or standards. The law regulating exposure of laboratory personnel to hazardous chemicals, referred to as the "OSHA Laboratory Standard," covers UW laboratories and is enforced by Wisconsin's Department of Industry, Labor and Human Relations. At trial, the court took judicial notice that Wis. ADMIN. CODE § Comm. 32.50(2) (Mar. 1999) incorporates by reference 29 C.F.R. pt. 1910 (1999), the OSHA standards. WISCONSIN ADMIN. CODE § Comm. ch. 32 (Mar. 1999) is entitled "Public Employee Safety and Health;" Title 29 C.F.R. § l910.1450 (1999) is entitled "Occupational exposure to hazardous chemicals in laboratories." The Guide and the OSHA Laboratory Standard point out that "Lab Directors, Managers and Supervisors" have compliance responsibilities, one of which is to inform and train laboratory personnel at the time of their initial work assignment as to the hazards of chemicals, including cryogenic liquids, in the workplace. Neither Chapman, who was Earles-Ochsner's direct supervisor, nor Moss, the Department chair, ever instructed Earles-Ochsner how to use the liquid nitrogen container.

¶ 15. After discovering that the cells had thawed, attempts were made to salvage them, but none survived. Dr. Yao has not been able to duplicate the lost cell lines or to purchase any commercially. The loss diminished his opportunities for getting published in recog-

456

nized journals and imperiled the likely renewal of his NIH and American Cancer Society grants.

¶ 16. Dr. Yao sued Chapman and Moss, as well as the UW and the Board of Regents of the University of Wisconsin System and their agents, alleging negligence, breach of bailment and breach of contract. The defendants moved for summary judgment. Although the trial court granted the motion as to the UW and the Board of Regents on the basis of sovereign immunity, the court denied the motion as to Moss and Chapman on the grounds that the summary judgment record did not support the professors' defense of public officer immunity when performing discretionary conduct.[2]

¶ 17. At the conclusion of a two-day bench trial, the trial court found that the parties had created a gratuitous bailment under an implied contract and that the professors had breached the standard of care imposed by the bailment. The court then rejected the professors' claim of public officer immunity. The court concluded that while Moss' decision to secure and protect Dr. Yao's property in the first instance was discretionary, once that responsibility was voluntarily undertaken, the ensuing acts were ministerial, thereby exposing Moss and his agents, including Chapman, to liability for their negligence. The court awarded Dr. Yao $415,712.

## DISCUSSION

### *Dr. Yao's Bailment and Negligence Claims*

¶ 18. We begin with Dr. Yao's breach of bailment and negligence claims. We address these claims in a single discussion since the premise of Dr. Yao's breach of

---

[2] This ruling was made by Judge Paul Higginbotham. The later trial was heard by Judge James Martin. We review Judge Martin's rulings on this appeal.

bailment claim is premised upon his contention that the professors were negligent in failing to properly preserve his cell lines.

¶ 19. A bailment is created by the delivery of personal property from one person to another to be held temporarily for the benefit of the bailee, the bailor, or both. *Manor Enters., Inc. v. Vivid, Inc.*, 228 Wis. 2d 382, 398, 596 N.W.2d 828 (Ct. App. 1999). Such a bailment may be created pursuant to an express or implied contract. *Id.* However, a gratuitous bailment does not require a contract or an actual meeting of the minds. *See Burns v. State*, 145 Wis. 373, 380, 128 N.W. 987 (1910). "It is the element of lawful possession, however created, and duty to account for the thing as the property of another, that creates the bailment, regardless of whether such possession is based on contract in the ordinary sense or not." *Id.* A gratuitous bailment is one for which the bailee receives no compensation. BLACK'S LAW DICTIONARY 152 (8th ed. 2004).

¶ 20. We agree, and the professors really do not dispute, that the circumstances under which they came into possession and control of Dr. Yao's research materials constituted a gratuitous bailment. Dr. Yao's cell lines remained his personal property, but temporarily were held and controlled by Moss, and later Chapman, for Dr. Yao's benefit. The trial court correctly ruled that the circumstances created a gratuitous bailment.

¶ 21. Having gratuitously accepted the bailment, the professors owed Dr. Yao a duty to safeguard his cell lines in a nonnegligent fashion.[3] *See Bushweiler v. Polk*

---

[3] Quoting *Bushweiler v. Polk County Bank*, 129 Wis. 2d 357, 360, 384 N.W.2d 717 (Ct. App. 1986), the professors assert that

*County Bank,* 129 Wis. 2d 357, 359, 384 N.W.2d 717 (Ct. App. 1986). Whether the professors were negligent under the bailment presents a mixed question of fact and law. *Id.* at 360. The trial court's factual findings will be upheld unless clearly erroneous. *Id.* Whether those facts fulfill a particular legal standard such as negligence presents a question of law. *Id.* While typically we review de novo a trial court's legal conclusions, where, as here, they are intertwined with the factual findings, we give weight—though not total deference—to the trial court's decision. *Id.*

¶ 22. Here, the trial court found, and the record shows, that Moss, as chairman of the Department, barred Dr. Yao from the laboratory where his research materials were stored; that, through their attorneys, Dr. Yao asked for and received Moss' personal assurance that his cell stock would be properly cared for and protected; and, again later, that the cell lines were being fully cared for; and that the liquid nitrogen tank and

where a gratuitous bailment exists, the "conduct in question should be considered as ordinary negligence." This is correct as far as it goes. They fail to note, however—perhaps because the thrust of their appeal is that they are immune from negligence actions—that, under *Bushweiler,* they actually owed a diminished duty of care. *Id. Bushweiler* clarifies that the change in Wisconsin's negligence law from gross to ordinary negligence did not simultaneously abolish the three-tier standard of care owed by bailees. *Id.* at 359. Under gross negligence principles, a gratuitous bailee was said to owe only a "slight" duty of care. *Smith v. Poor Hand Maids of Jesus Christ,* 193 Wis. 63, 67, 213 N.W. 667 (1927). Although Wisconsin no longer embraces that doctrine, "there still remains a diminished duty of care from a gratuitous bailee." *Bushweiler,* 129 Wis. 2d at 360. We have no trouble concluding, however, that the professors failed even to satisfy this lesser duty of care with respect to safeguarding Dr. Yao's property.

the laboratory itself would be kept locked and Moss controlled the keys to both.

¶ 23. Thereafter, the undisputed facts demonstrate a chain of lax behaviors. Moss granted lab access to Chapman, who in turn granted access to Earles-Ochsner, and neither of the professors gave Earles-Ochsner any training or information about working with the liquid nitrogen tank. Earles-Ochsner's contradictory testimony indicates that she likely replaced the lid improperly, thus allowing the liquid nitrogen to evaporate prematurely. Finally, the record reveals that when Moss discovered that the key to the tank was missing, instead of replacing the padlock, he had it removed.

¶ 24. In the face of these largely uncontested facts, we comfortably uphold the trial court's determination that the professors were negligent and breached their duty to Dr. Yao under the gratuitous bailment.

### The Professors' Public Officer Immunity Defense

¶ 25. We next consider whether, despite their negligence, the professors are shielded from liability by the doctrine of public officer immunity. The trial court concluded that the professors' threshold decision whether or not to safeguard Dr. Yao's research materials was discretionary, but once having undertaken to do so, they owed a ministerial duty under 29 C.F.R. pt. 1910 (1999) and the Wisconsin Administrative Code to act in a certain manner. *See Kierstyn v. Racine Unified School Dist.*, 228 Wis. 2d 81, 93, 596 N.W.2d 417 (1999).

¶ 26. For state officers and employees, immunity from tort liability is the rule and liability is the exception. *See Lodl v. Progressive Northern Ins. Co.*, 2002 WI

71, ¶ 22, 253 Wis. 2d 323, 646 N.W.2d 314. Public officer immunity arises not from the state's sovereign immunity, which is constitutional[4] in nature, but from the common law. *See Lister v. Board of Regents*, 72 Wis. 2d 282, 299, 240 N.W.2d 610 (1976). Immunity is rooted in public policy considerations that strike a balance between the need of public officers to perform their functions freely and the right of an aggrieved party to seek redress, *id.* at 300, and focus on protecting the public purse and a preference for political rather than judicial redress for actions. *Meyers v. Schultz*, 2004 WI App 234, ¶ 11, 277 Wis. 2d 845, 690 N.W.2d 873.

¶ 27. Immunity exists for a public employee's negligent acts performed pursuant to a discretionary duty, but not pursuant to a ministerial duty. *Spencer v. County of Brown*, 215 Wis. 2d 641, 647, 573 N.W.2d 222 (Ct. App. 1997). Whether a duty is discretionary or ministerial is a question of law that we review de novo. *Id.* at 648; *see also Bicknese v. Sutula*, 2003 WI 31, ¶ 15, 260 Wis. 2d 713, 660 N.W.2d 289. A discretionary duty involves "the exercise of discretion of judgment in determining the policy to be carried out or the rule to be followed [and] the exercise of discretion and judgment in the application of a rule to specific facts." *Spencer,* 215 Wis. 2d at 648 (citation omitted). A public employee's duty is ministerial "only when it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Lister*, 72 Wis. 2d at 301 (footnote omitted).

---

[4] Wis. Const. art. IV, § 27.

461

¶ 28. The trial court agreed with Dr. Yao that the professors' duty was ministerial. The court cited *Bicknese*, which it termed "very similar" to this case, for the proposition that once public officers choose in their discretion to act, they are bound by a ministerial duty to act in a particular way. *Bicknese*, 260 Wis. 2d 713, ¶ 26. The court evidently was persuaded that OSHA laboratory standards, particularly 29 C.F.R. § 1910.1450, as incorporated by reference in the Wisconsin Administrative Code, provided the authority and particularity necessary to create a ministerial duty.

¶ 29. We are not so persuaded. A close reading of *Bicknese* compels us to conclude that this case and *Bicknese* are not "very similar." In *Bicknese*, Sutula, a department chair at the University of Wisconsin Medical School, tendered to Bicknese an apparent offer as an untenured professor. *Bicknese*, 260 Wis. 2d 713, ¶ 3. He erroneously informed her that she would have five years to qualify for tenure, when UW rules actually mandate three years, with any extensions requiring approval. *See id.*, ¶¶ 7, 9–10. In the end, the medical school did not make Bicknese a formal offer because it determined achievement of tenure in three years would be unlikely. *Id.*, ¶ 10. In the meantime, Bicknese turned down another offer based on Sutula's representations regarding an offer and tenure. *See id.*, ¶ 9. The supreme court held that, while Sutula had the discretion to offer Bicknese a position, once he did so he had a ministerial to act in a certain manner. *Id.*, ¶ 26. Critical in *Bicknese* is that the "certain manner" was dictated by the "clear mandate" of § 7.04 of the UW Faculty Policies and Procedures adopted pursuant to Chapter UWS 3 of the Wisconsin Administrative Code which precisely directed the setting of tenure clocks. *Bicknese*, 260 Wis. 2d 713, ¶ 28. In keeping with other

public officer immunity cases, *Bicknese* makes clear that for a duty to be ministerial, a public officer must be not only bound to act, but also bound by law to act in a very particular way, leaving nothing for judgment or discretion. *Id.*, ¶ 21.

¶ 30. The latter prong is where Dr. Yao's argument, and the trial court's conclusion, falter. As in *Bicknese*, the regulations Dr. Yao relies upon also were adopted pursuant to the Wisconsin Administrative Code law. 29 C.F.R. § 1910.1450, entitled "Occupational exposure to hazardous chemicals in laboratories," is incorporated by reference into Wis. ADMIN. CODE § Comm. ch. 32, "Public Employee Safety and Health." As these titles suggest, and as the substance of the regulations reveal, these are safety rules, addressing exposure to hazardous chemicals in a laboratory setting. They instruct laboratory personnel to exercise caution when working with chemicals and cryogenics such as liquid nitrogen. They also advise employers to ensure that lab personnel are properly trained and apprised of the hazards of the chemicals to which they may be exposed in their work area. As such, these regulations are not targeted at insuring the integrity and preservation of hazardous chemicals themselves. Rather, they are intended to assure the safety of those who handle, or otherwise may be exposed to, such materials. Thus, the regulations have no relevance to the issue in this case.

¶ 31. Moreover, the duties under these regulations suffer from a critical lack of particularity as to time, mode and occasion of their performance, an essential ingredient of a ministerial duty. *See Bicknese*, 260 Wis. 2d 713, ¶ 21. The regulations direct, in part:

> (1) The employer shall provide employees with information and training to ensure that they are apprised of the hazards of chemicals present in their work area.

463

(2) Such information shall be provided at the time of an employee's initial assignment to a work area where hazardous chemicals are present and prior to assignments involving new exposure situations. The frequency of refresher information and training shall be determined by the employer.

29 C.F.R. § 1910.1450(f).

¶ 32. The standards say nothing about access to or control of a liquid nitrogen tank, how or how often to determine whether the liquid nitrogen level is sufficient, how to replenish the liquid nitrogen when it becomes necessary to do so, or how to properly open and refasten the tank lid. Moreover, permitting the employer to determine the frequency of delivering certain of the training plainly contemplates a measure of discretion in executing the standards. In short, the standards fall fatally short of the necessary "clear mandate" for the action the professors needed to take. *See Bicknese*, 260 Wis. 2d 713, ¶ 28. They do not "impose[], prescribe[] and define[] the time, mode and occasion" of performance under the law of public officer immunity, such that the duties at issue are rendered ministerial. *Id.*, ¶ 21; *Lister*, 72 Wis. 2d at 301.[5]

¶ 33. Conceding that the C.F.R. and administrative code standards might lack precision, Dr. Yao further argues that "instructions concerning the use of

---

[5] Based on this reasoning, we likewise decline Dr. Yao's invitation to find a ministerial duty based on other cases he suggests are in his favor. For instance, we disagree that the Guide and the OSHA standards are akin to the administrative rules directing the placement of a highway warning sign, *Chart v. Dvorak*, 57 Wis. 2d 92, 101–02, 203 N.W.2d 673 (1973), or the written contract dictating the terms of the sale of county property, *Major v. County of Milwaukee*, 196 Wis. 2d 939, 944–45, 539 N.W.2d 472 (Ct. App. 1995).

laboratory equipment will most likely not come from the federal code but will come from the manufacturer of the equipment and the experience of the supervisor of the lab." We reject this argument for two reasons. First, the law necessary to define a ministerial task does not include manufacturer's instructions. *See Meyers*, 277 Wis. 2d 845, ¶ 19. Second, Dr. Yao offers no case law to explain how instructions founded on an individual's unique experience could be anything but discretionary.

¶ 34. In addition, like the C.F.R. and administrative code standards, the parties' arrangement producing the gratuitous bailment is also devoid of any understanding or terms regarding the needed specificity of time, mode and occasion to create a ministerial duty. The contours of the arrangement were essentially these: Dr. Yao could store his cell lines in the liquid nitrogen tank in the laboratory he had used prior to his suspension; the tank and the lab in which it was situated both would be kept locked; Moss would keep the lab key; at unspecified intervals Dr. Yao's former student would retrieve the lab key from Moss or another Department staff person to check the liquid nitrogen level; and Zheng would periodically replenish the liquid nitrogen. While the parties' arrangement created a bailment with a concomitant legal duty, it did not define the duty with the requisite time, mode and occasion in order to render the duty ministerial.

¶ 35. At bottom, Dr. Yao's core argument is not that the safety guidelines or any informal contract between the parties imposed an unambiguous legal duty on the professors. Rather, it is that the professors acted negligently under the duty imposed by the bailment. Moss gave a lab key to Chapman, Dr. Yao's principal accuser in the sabotage matter. Chapman, in

turn, gave a key to Earles-Ochsner. On her own initiative, Earles-Ochsner used the liquid nitrogen tank storing Dr. Yao's materials despite knowing that a tank in another lab was available for her use, and despite being unfamiliar with such tanks and being untrained in their use by Moss, Chapman or anyone else. Finally, when the key to the storage tank went missing, Moss had the lock removed. As we have noted, the evidence shows that the conduct of the professors was negligent, but the evidence does not support the trial court's legal conclusion that the professors' duty was ministerial. As such, the professors are immune from liability for their negligence.

### Dr. Yao's Breach of Contract Claim

¶ 36. We next turn to Dr. Yao's breach of contract claim.[6] The trial court found that the parties' gratuitous bailment was the product of an implied contract. Because the facts bearing on this question are undisputed, we determine de novo whether a contract existed.[7] *See*

---

[6] We summarily reject the professors' argument that Dr. Yao's contract claim is barred because of sovereign immunity. The doctrine of sovereign immunity does not apply to suits for damages against public officers as individuals. *Graney v. Board of Regents*, 92 Wis. 2d 745, 756, 286 N.W.2d 138 (Ct. App. 1979), *abrogated on other grounds, Bicknese v. Sutula*, 2003 WI 31, ¶ 18, 260 Wis. 2d 713, 660 N.W.2d 289.

[7] Dr. Yao did not argue to the circuit court that governmental or public officer immunity does not apply where the governmental entity or the public officer has entered into a contract, despite case law supporting that point. *See Energy Complexes, Inc. v. Eau Claire County*, 152 Wis. 2d 453, 464–65, 449 N.W.2d 35 (1989). Nor does Dr. Yao make that argument on appeal. Rather, Dr. Yao's argument is that the duty assumed by the professors under the alleged contract was ministerial. However,

*Gustafson v. Physicians Ins. Co. of Wis.*, 223 Wis. 2d 164, 173, 588 N.W.2d 363 (Ct. App. 1998).

¶ 37. As we have noted, a gratuitous bailment does not necessarily require a formal contract.

> No particular ceremony or actual meeting of minds is necessary to the creation of a bailment. If one, without the trespass which characterizes ordinary larceny, comes into possession of any personalty of another and is in duty bound to exercise some degree of care to preserve and restore the thing to such other or to some person for that other, or otherwise account for the property as that of such other, according to circumstances,—he [or she] is a bailee. It is the element of lawful possession, however created, and duty to account for the thing as the property of another, that creates the bailment, regardless of whether such possession is based on contract in the ordinary sense or not.

*Burns*, 145 Wis. at 380. Under a bailment, "the word 'contract' is used in a broad sense." *Id.* at 381. Furthermore, a bailment is rooted in tort principles of negligence, not contract. *See Bushweiler*, 129 Wis. 2d at 359–60.

¶ 38. We also may look to the complaint in its entirety to see if, as a whole, it sounds in contract or tort. *See Boehrer v. Juergens & Anderson Co.*, 133 Wis. 426, 429, 113 N.W. 655 (1907). Where a complaint alleges both a breach of contract and a tort, the "true and logical test" of how the complaint should be construed is if it appears that the contract is alleged to

---

Dr. Yao's failure to argue this potential issue is of no consequence since, as our discussion will reveal, the parties' arrangement did not achieve a contract.

show the existence of a duty and the emphasis is on willful or wrongful disregard of the duty, the intent is to charge a tort. *Id.* at 429. If, by contrast, the emphasis is on default in carrying out the contract, the intent is to charge a breach of contract. *Id.* at 429–30.

¶ 39. The complaint here states three causes of action. Counts I and II are styled "Negligence" and "Breach of Bailment," respectively. Between them, they contain a dozen paragraphs and subparagraphs cataloging the defendants' wrongful disregard of their duty. Count III, denominated "Breach of Contract," reads in its entirety:

> 33. The defendants and their agents agreed to secure and protect the cell lines while the cell lines were in their custody and control.
>
> 32. The defendants breached this agreement when they permitted the cell lines to be destroyed.

Although the claim is labeled as a breach of contract, looking at the complaint as a whole, we conclude that the core of Dr. Yao's claim remains tort based.

¶ 40. Our conclusion is borne out by the trial court proceedings following the pleadings. Dr. Yao's core argument was that the professors were negligent in the discharge of their duties under the bailment, and the evidence at trial focused almost exclusively on the professors' conduct under the gratuitous bailment. The same is true of Dr. Yao's pretrial and posttrial briefs.

¶ 41. Even if we were to indulge Dr. Yao's contract argument, we reject it because the evidence fails to establish consideration. Harlowe, Dr. Yao's lawyer, testified that he believed that the consideration took the

form of Dr. Yao refraining from seeking injunctive action against the UW. However, Harlowe acknowledged that he and the UW's attorney never explicitly discussed this and that he had only a general understanding of the arrangement for safeguarding Dr. Yao's cell stock. A party's subjective belief as to a provision of a contract is not controlling. *See Gerruth Realty Co. v. Pire*, 17 Wis. 2d 89, 92, 115 N.W.2d 557 (1962). While the question of whether consideration supports a contract is normally a question of fact, *NBZ, Inc. v. Pilarski*, 185 Wis. 2d 827, 838, 520 N.W.2d 93 (Ct. App. 1994), here the evidence as to consideration is so lacking that we comfortably state as a matter of law that no contract was achieved. *Cf. Siva Truck Leasing, Inc. v. Kurman Distribs.*, 166 Wis. 2d 58, 68, 479 N.W.2d 542 (Ct. App. 1991) (In determining whether there was sufficient consideration for a novation, weight is accorded the trial court's decision, but whether the facts fulfill a legal standard is a matter of law.). The gratuitous bailment in this case was not the product of any contract, implied or otherwise.

¶ 42. Even if it could be said that the parties managed to create an agreement, it is devoid of any terms detailing the manner by which the professors were to tend to Dr. Yao's cell lines. On this point, we further discuss *Major v. County of Milwaukee*, 196 Wis. 2d 939, 539 N.W.2d 472 (Ct. App. 1995), a case we have already rejected as support for Dr. Yao's claims. *See infra* n.5. We speak in further detail to *Major* because both the trial court's decision and the predecessor court's summary judgment ruling relied upon this authority. Both courts cited *Major* for the proposition that while the initial governmental decision to enter into a contract is discretionary, once the contract is made, the duty thereunder is ministerial.

¶ 43. In *Major*, the plaintiff sued Milwaukee county for breach of contract, claiming that the county had falsely represented the condition of real estate that he had purchased from the county. *Id.* at 941. The trial court granted summary judgment to the county based upon the immunity for discretionary acts conferred by Wɪs. Sᴛᴀᴛ. § 893.80(4). *Major*, 196 Wis. 2d at 942.

¶ 44. We reversed, noting that the plaintiff's summary judgment evidence showed that the county had prior notice of the defect, the county had represented that the property was without defect, and the plaintiff had relied on that representation in making his decision to purchase the property. *Id.* at 945–46. Under those circumstances, the court concluded that, while the county had discretion whether to enter into the contract, once the decision to contract was made, the county was bound by its representation that it had no notice or knowledge of the defect. *Id.* at 944–45. "Milwaukee County was under an 'absolute, certain and imperative' duty not to make this representation unless it was true." *Id.* at 945 (citation omitted).

¶ 45. Here, unlike *Major*, there is no evidence demonstrating, either directly or inferentially, an "absolute, certain [or] imperative" manner by which the professors were to tend to Dr. Yao's cell lines under the gratuitous bailment. *See id.* This is not a *Major* case.

¶ 46. In summary, considering Dr. Yao's complaint in its entirety, we conclude that the breach of contract cause of action, although framed in contract language, is in reality a recapitulation of the tort claim. Moreover, even allowing that the complaint stated a contract claim, the evidence failed to show consideration to support a contract. And even if a contract existed, it fails to prescribe the necessary mode of conduct under

470

*Major* such that the professors' duty could be termed ministerial. As such, Dr. Yao's contract claim fails.

## CONCLUSION

¶ 47. Although we uphold the trial court's rulings that the parties created a gratuitous bailment and that the professors were negligent, we reverse the court's further ruling that the bailment created a ministerial duty on the part of the professors. We also hold that Dr. Yao's contract claim is, at its core, a tort-based claim and is therefore governed by our holding that the professors' duty was not ministerial. Alternatively, we hold that the evidence fails to show consideration in support of a contract claim, and even if a contract was achieved, the professors' duty was not ministerial under *Major*.

*By the Court.*—Judgment reversed.