Michael PRIES,
Plaintiff-Respondent-Cross-Appellant,

v.

Raymond McMILLON,
Defendant-Appellant-Cross-Respondent-
Petitioner,

ABC INSURANCE COMPANY,
Defendant.

Supreme Court

*No. 2008AP89. Oral argument March 9, 2010.
—Decided July 2, 2010.*

2010 WI 63

(Also reported in 784 N.W.2d 648.)

For the defendant-appellant-cross-respondent-petitioner the cause was argued by *Charlotte Gibson,* assistant attorney general, with whom on the briefs was *J.B. Van Hollen,* attorney general.

For the plaintiff-respondent-cross-appellant there was a brief by *Merrick R. Domnitz, Anthony J. Skemp,* and *Domnitz & Skemp, S.C.,* Milwaukee, and oral argument by *Merrick R. Domnitz.*

An amicus curiae brief was filed by *Robert L. Jaskulski* and *Habush, Habush & Rottier,* S.C., Milwaukee, and *William C. Gleisner, III and the Law Offices of William Gleisner,* Milwaukee, on behalf of the Wisconsin Association for Justice.

¶ 1. N. PATRICK CROOKS, J. This is a review of a published decision of the court of appeals[1] affirming the circuit court's judgment that the defendant, Raymond McMillon (McMillon), is not entitled to governmental immunity[2] as a state employee for negligently causing

[1] *Pries v. McMillon,* 2008 WI App 167, 314 Wis. 2d 706, 760 N.W.2d 174.

[2] Governmental immunity is also described as "discretionary immunity" or "discretionary act immunity" in our case law.

injuries to the plaintiff, Michael Pries (Pries), when the parties were disassembling horse stalls at the Wisconsin State Fair Park.

¶ 2. The scope of our analysis is limited. The parties do not dispute the circuit court's findings that McMillon was negligent and that his negligence caused injury to Pries. Additionally, there is no dispute that McMillon is a state employee to whom governmental immunity could apply to shield him from liability for his negligent acts. Rather, the issue here is whether under these circumstances either of two exceptions to immunity applies: the ministerial duty exception and the "known danger" exception. Both the circuit court and the court of appeals concluded that an exception applied, and that McMillon was not entitled to the defense of governmental immunity. However, each court reached that conclusion based on a different exception. The circuit court, the Honorable Michael B. Brennan presiding, concluded that McMillon was not protected by governmental immunity under these circumstances because the ministerial duty exception applied; that court also determined that the known danger exception was not applicable. In contrast, the court of appeals held that McMillon was not entitled to governmental immunity because the known danger exception applied, but it declined to address whether the ministerial duty exception was applicable.

¶ 3. We affirm, although on different grounds than the court of appeals. We are satisfied that, under the circumstances presented here, the ministerial duty exception to governmental immunity applies. Specifi-

*See, e.g., Bicknese v. Sutula,* 2003 WI 31, ¶ 67 n.3, 260 Wis. 2d 713, 660 N.W.2d 289; *Kimps v. Hill,* 200 Wis. 2d 1, 546 N.W.2d 151 (1996). For simplicity, we use the term "governmental immunity" throughout this opinion.

cally, State Fair Park instructions to "[a]lways have someone holding up the piece that you are taking down" created a ministerial duty that McMillon violated when he failed to ensure that the stall pieces were secured. Hence, McMillon is not protected by a defense of governmental immunity, and is liable for his negligent acts that caused injury to Pries.

## I. FACTS AND PROCEDURAL BACKGROUND

¶ 4. In September 2005, through an arrangement between the Milwaukee House of Corrections and the Wisconsin State Fair Park, a group of approximately 12 inmates were brought to the Park to assist in taking down structures. Pries was one of the inmates in that group, which was assigned to dismantle horse stalls. McMillon, a full-time employee with the State Fair Park, supervised the inmates.

¶ 5. The stalls are made up of four steel pieces: a front, back, and two sides. Each piece is solid steel with horizontal bars running across the upper portion. Each piece measures approximately 10 feet high, 10 feet wide, and four inches thick, and each weighs approximately 200 pounds. According to Ross Stein (Stein), the supervising correctional officer who accompanied the inmates, each piece "usually took four individuals to pick [it] . . . up." When assembled, the pieces are secured to each other with pins, and the side and back pieces are secured to a wall with chains. In total, there were 10 to 12 stalls in a row where the inmates were working.

¶ 6. Pries dismantled several stalls with two other inmates. At one point, Pries' crew struggled to dislodge a stall piece that was stuck to another piece. According to Pries, McMillon approached the inmates and told

them, "[L]et me show you how we do it." McMillon observed that the chains responsible for securing the pieces had been removed and commented they should not have been. Despite that, according to Pries, McMillon "jumped up" on and straddled a stall next to the piece that the inmates were trying to free and "started jerking it up and down" with his hands. Immediately after, there was a "devastating accident," according to Stein, in which unchained stall pieces started falling in a "domino effect" on the inmates, striking all three of them. As for Pries, a falling piece struck him in the face, knocked him to the ground, and pinned him underneath it. After several people helped lift the piece to free Pries, he was taken to a hospital and treated for a broken foot, along with other injuries.

¶ 7. Pries sued McMillon and the State Fair Park's insurer on a theory of negligence.[3] McMillon filed a motion to dismiss and a motion for summary judgment, asserting that, as a state employee, he was entitled to governmental immunity for negligent acts committed in the scope of his employment and that no exceptions to that rule of immunity applied. The Milwaukee County Circuit Court, the Honorable Francis T. Wasielewski presiding, denied each of McMillon's motions. The case proceeded to a court trial.

¶ 8. At trial, two other witnesses corroborated Pries' description of the accident. However, McMillon denied jumping on or shaking the stall or causing the collapse. Rather, he claimed that he was working about 60 feet away in a different area of the barn. He testified that Pries' crew drew his attention because they were

---

[3] Pries also included the Milwaukee County Department of Health and Human Services as a defendant. Pries subsequently voluntarily dismissed the department as a party.

"taking down the chains and there was no one holding up the stalls." He claimed that he started to approach them to correct the situation, and that the stalls began falling when he was about 30 feet away.

¶ 9. At trial, Pries introduced a two-page written procedure in effect at the time of the accident setting forth the proper method of disassembling the horse stalls. Patricia Hedden (Hedden), the operations director at the State Fair Park, acknowledged that the instructions were a State Fair document in effect before September 2005. Ken Jaeger (Jaeger), McMillon's supervisor, described those instructions as "the procedure that we created for . . . putting up and taking down the . . . horse stalls." McMillon testified that he received those instructions years before the accident, and that the procedure had not changed in the years leading up to the accident. Those instructions require a "[m]inimum of [four] people to set up the stalls" and explain how to secure the pieces together. Specifically, that document provided procedures for "Take Down" in section six. Part (a) of that section states, "*Always* have someone *holding* up the *piece* that you are taking down." (Emphasis added.) The instructions do not mention the chains or how to proceed if the stall pieces become jammed together.

¶ 10. McMillon acknowledged that the written instructions were in effect at the time of the accident and that he was familiar with them.[4] He stated that he did not have the ability to vary from the take-down

---

[4] McMillon later stated that he first saw the instructions after the accident, in connection with the present case. On cross-examination, however, he acknowledged deposition testimony in which he stated that he was familiar with the instructions and that they had been in use at the State Fair Park for several years leading up to the time of the accident.

procedure when taking down or removing the stalls and confirmed that the "same procedure [had] to be followed in the tear-down procedure every single time."[5]

¶ 11. He also stated that he knew that if the stalls were not disassembled in an appropriate manner, they posed a risk of injury. He confirmed that he knew that if the chains had been removed from the back stall pieces, the stalls could fall and injure people standing nearby, particularly if someone jumped up on the stalls. He also confirmed that he knew that the chains in fact had been removed from the stall piece that started the collapse.

¶ 12. Jaeger testified that the written instructions contained the "fundamentals" of taking down the stalls. He said that he exercised discretion and judgment when taking down the pieces, and expected his employees to do so as well. However, when asked whether there was any legitimate reason to stand on or shake unsecured stall pieces, Jaeger noted that although there was no written policy expressly forbidding such behavior, it was "more of a common sense thing, if the chains were removed, then one should not be jumping on stalls."[6]

---

[5] McMillon gave conflicting testimony as to the level of discretion he could use when taking down the stalls. After telling Pries' counsel that he had to follow the same procedure every time, he later stated, when asked by his counsel, that he was able to use his own judgment in performing his job tasks and that the take-down procedures in section six did not describe everything he did when taking down stalls. Pries' counsel, as the circuit court noted, then successfully impeached McMillon's in-court testimony with his answers to questions at his deposition that he was to follow the same procedures every time he dismantled the stalls, and that he did not have the ability to change the procedure to be followed.

[6] In a pre-trial deposition, Jaeger also made the following comments:

¶ 13. The circuit court, the Honorable Michael B. Brennan presiding,[7] found that Pries' description of the accident was more credible than McMillon's and that McMillon "was jumping on the stalls to loosen them before the stalls toppled and injured . . . Pries."[8] It also found "McMillon's statement regarding the chains, including [his statement in Exhibit 14, a statement in which McMillon reiterated that he noticed, from a distance, that the inmates had created a hazardous situation by removing the chains], to be self-serving and

Q [Pries' counsel]: And if someone were to go down and remove the chains on all of the separate pieces, that would be a violation, correct?

A [Jaeger]: Correct.

Q: Do you know why that would be a violation of the procedure?

A: Because all the stall pieces would fall.

Q: Which would create a danger for those taking down the stalls, correct?

A: Correct.

[7] In July 2007, Judge Brennan replaced Judge Wasielewski as the presiding judge on this case.

[8] The witnesses, parties, circuit court, and court of appeals use a variety of terms to describe the four individual stall pieces, such as "section," "piece," "fence," and "wall." We understand those terms to be used interchangeably to refer to the individual stall pieces.

Additionally, the witnesses, parties, circuit court, and court of appeals also appear to use the term "stall" interchangeably to refer to a fully or partially assembled horse stall as well as individual stall pieces. Generally, context clarifies the intended meaning of "stall" when that word appears in the record, briefs, and other materials. However, unless directly quoting, we use, for consistency, the word "stall" to refer to fully or partially assembled horse stalls and "piece" or "pieces" to refer to one or more of the individual stall pieces.

not credible." Based on those facts, the circuit court concluded that McMillon was negligent and that that negligence was a substantial factor in causing Pries' injuries:

> Defendant McMillon had experience, training, and knowledge with regard to the assembly and disassembly of these stalls. In contrast, this was plaintiff Pries'[] first time doing so. Defendant McMillon saw the inmates having problems, defendant McMillon was aware the stalls were stuck, he was aware the chains were undone, and was aware that inmates were standing next to the stuck stall. Defendant McMillon was negligent to jump on the stalls, which created danger, the stalls fell, and plaintiff was injured by the falling stalls.

¶ 14. As to whether McMillon was protected by immunity from liability for that negligence, the circuit court concluded that Pries met his burden of proof in establishing that defendant violated a ministerial duty provided "by State Fair policy" in the written instructions:

> The guidelines for disassembling the horse stalls . . . do not indicate that employees following the directives have any discretion to disassemble (or assemble) the stalls in any way they chose. Chains necessary for holding the stalls together had been disconnected. Defendant McMillon jumped on the stall anyway. Defendant McMillon was aware of the disassembly methods as specifically designated by the State Fair policy . . . but did not follow them. He deviated from the written procedure, which resulted in plaintiff Pries'[] injuries.

¶ 15. The circuit court also concluded that McMillon, based on his own deposition and testimony, did not have discretion to deviate from the disassembly instructions. Accordingly, it held the ministerial duty exception applied and that as a result, governmental immunity

48

did not shield McMillon from liability. It awarded a total judgment to Pries for his medical bills and for pain and suffering of approximately $14,000 plus costs and attorney fees.[9]

¶ 16. McMillon appealed to the court of appeals, arguing that the circuit court erred in concluding that the ministerial duty exception applied. Pries cross-appealed the portion of the circuit court's judgment in which it concluded that the known danger exception did not apply. The court of appeals affirmed the circuit court on different grounds. It accepted the circuit court's findings of fact, but diverged from the circuit court's reasoning by concluding that the known danger exception to immunity applied. The court of appeals based that determination on McMillon's knowledge that the stalls were dangerous to stand or jump on when unchained, his awareness that the chains were undone when he jumped on the stall, and his awareness that the inmates were standing in the path of the stall pieces if they fell. *Pries v. McMillon,* 2008 WI App 167, ¶¶ 24–25, 314 Wis. 2d 706, 760 N.W.2d 174. Based on that conclusion, the court of appeals declined to evaluate whether the ministerial duty exception also applied. *Id.,* ¶ 1.

## II. PARTIES' ARGUMENTS, ISSUES, AND STANDARD OF REVIEW

¶ 17. Before this court, McMillon argues that the court of appeals erred in concluding that the known

[9] The circuit court also concluded that the known danger exception did not apply under these circumstances, rejecting Pries' theory that McMillon's failure to train and supervise the inmates created a "known and present danger" of inmate injury. It observed that there was no evidence in the record that previous volunteers or inmates created dangerous situations warranting such a duty to train and supervise.

49

danger exception applies under these circumstances. Pries responds that the court of appeals correctly concluded that the known danger exception applies. Pries further asserts that, even if that exception did not apply, the ministerial duty exception should apply as an alternative ground to affirm the court of appeals. Moreover, at oral argument, counsel for Pries urged this court to reaffirm a general rule initially set forth in *Holytz v. City of Milwaukee,* 17 Wis. 2d 26, 115 N.W.2d 618 (1962). That rule, since abrogated by case law, provided that in cases alleging negligent acts by public officials, liability was the rule and governmental immunity was the exception.[10]

¶ 18. Hence, the issues we confront here focus on whether either the ministerial duty exception or, alternatively, the known danger exception applies under these circumstances to deprive McMillon of the defense of governmental immunity.

¶ 19. A defense of governmental immunity for public employees focuses on whether the action or inaction upon which liability is premised is entitled to immunity. *Lodl v. Progressive N. Ins. Co.,* 2002 WI 71, ¶ 17, 253 Wis. 2d 323, 646 N.W.2d 314. Whether an exception to immunity applies requires us to determine the proper scope of the common law doctrine of governmental immunity; that is a question of law that we review de novo without deference to the circuit court or court of appeals, but benefitting from the analysis of each court. *Kimps v. Hill,* 200 Wis. 2d 1, 8, 546 N.W.2d

---

[10] The Wisconsin Association for Justice submitted an amicus curiae brief with a similar argument urging this court to expand the exceptions to governmental immunity currently recognized in Wisconsin.

151 (1996). However, we are to uphold the circuit court's factual findings unless they are clearly erroneous. *Phelps v. Physicians Ins. Co.*, 2009 WI 74, ¶ 34, 319 Wis. 2d 1, 768 N.W.2d 615.

## III. DISCUSSION

¶ 20. The rule of governmental immunity provides that state officers and employees are immune from personal liability for injuries resulting from acts performed within the scope of their official duties. *Kimps,* 200 Wis. 2d at 10. Grounded in common law, the doctrine of governmental immunity is based on "public policy considerations that spring from an interest in protecting the public purse and a preference for political rather than judicial redress" for actions.[11] *Lodl,* 253 Wis. 2d 323, ¶ 23; *see also Lister v. Bd. of Regents,* 72 Wis. 2d 282, 299, 240 N.W.2d 610 (1976) (listing other policy considerations, such as the danger of influencing

---

[11] The doctrine of sovereign immunity is distinct from governmental immunity. *Bicknese,* 260 Wis. 2d 713, ¶ 67. Sovereign immunity is based in article IV, section 27 of the Wisconsin Constitution and is procedural in nature. *Id.,* ¶ 68. That doctrine provides, in essence, that the state cannot be sued without its consent. *Id.* A successful motion to dismiss on sovereign immunity grounds deprives the court of personal jurisdiction over the defendant, i.e., the state. *Id.*

As for the doctrine of governmental immunity, it treats municipal officials and employees differently from state employees in several ways. Most significantly, unlike governmental immunity as applied to state employees where immunity is the rule and liability is the exception, the opposite is true for municipal actors, i.e., liability is the rule and immunity is the exception. *Lodl v. Progressive N. Ins. Co.,* 2002 WI 71, ¶ 22, 253 Wis. 2d 323, 646 N.W.2d 314.

public officials with the threat of a lawsuit and the deterrent effect that the threat of a lawsuit might have on those considering public positions).

¶ 21. The rule of immunity is subject to exceptions, which seek to balance the rights of injured parties to seek compensation with the need for public officers and employees to perform their duties freely. *Lister,* 72 Wis. 2d at 300. The two exceptions at issue here apply when an officer or employee has no discretion in the performance of a particular duty.

¶ 22. First, a state officer or employee will not be "shielded from liability for the negligent performance of a purely ministerial duty." *Kimps,* 200 Wis. 2d at 10. The test in Wisconsin for whether a duty is discretionary or ministerial was articulated initially in *Meyer v. Carman,* 271 Wis. 329, 332, 73 N.W.2d 514 (1955). That test, as described by this court, provides:

> A public officer's duty is ministerial only when it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion.

*Lister,* 72 Wis. 2d at 301; *see also C.L. v. Olson,* 143 Wis. 2d 701, 711–12, 422 N.W.2d 614 (1988). Stated differently,

> a duty is regarded as ministerial when it has been positively imposed by law, and its performance required at a time and in a manner, or upon conditions which are specifically designated, the duty to perform under the conditions specified not being dependent upon the officer's judgment or discretion. If liability is premised

> upon the negligent performance (or non-performance) of a ministerial duty imposed by law or government policy, then immunity will not apply.

*Lodl*, 253 Wis. 2d 323, ¶ 26 (internal quotation marks and citations omitted).

¶ 23. Second, the known danger exception operates in situations where an obviously hazardous situation exists and "the nature of the danger is compelling and known to the officer and is of such force that the public officer has no discretion not to act." *C.L.*, 143 Wis. 2d at 715. The seminal Wisconsin case applying the known danger exception is *Cords v. Anderson,* 80 Wis. 2d 525, 259 N.W.2d 672 (1977). *Cords* involved an accident where hikers, legally accessing a park hiking trail during nighttime, fell into a deep gorge from a hazardous portion of the trail. In that case, we concluded that the park manager, who had known that the trail was particularly dangerous after dusk, had a ministerial duty to place warning signs or advise superiors of the trail condition. *Id.* at 541–42; *see also Voss v. Elkhorn Area Sch. Dist.,* 2006 WI App 234, 297 Wis. 2d 389, 724 N.W.2d 420 (holding that a ministerial duty to end a class exercise arose for purposes of the known danger exception where students wearing sight-altering goggles began stumbling and falling in a room full of hard obstacles).

¶ 24. The two exceptions overlap to an extent, inasmuch as they both require the identification of a ministerial duty. Indeed, the court of appeals in this case concluded that the known danger exception applied because "it should have been self-evident to McMillon that once he saw the chains had been removed, he had a ministerial duty based on the known danger to

stop the disassembly until the chains were reattached and to not jump on the unchained stall." *Pries,* 314 Wis. 2d 706, ¶ 25. As explained above, a ministerial duty for purposes of the ministerial duty exception is imposed by law or policy and performance is required in a time, manner, and under conditions where the officer does not exercise discretion or judgment. In contrast, the ministerial duty for purposes of the known danger exception arises not from a written law or policy, but when an obviously dangerous situation presents itself. As this court explained in *C.L.,* "[C]ircumstances may give rise to such a certain duty, where . . . the nature of the danger is compelling and known to the officer and is of such force that the public officer has no discretion not to act." 143 Wis. 2d at 715.

¶ 25. We begin with our analysis of whether the ministerial duty exception applies under the circumstances presented here. Pries identifies the take-down instructions as a source of law or policy dictating the ministerial duty here to disassemble the stalls in a specific manner. McMillon responds that those instructions do not create a ministerial duty because they lack direction on how employees are to use the chains or how they are to respond to the circumstances here, i.e., when pieces are stuck together. In light of the parties' positions, we frame the specific question here as follows: Did the instructions establish a ministerial duty that McMillon then violated when he jumped on and shook the stuck stall knowing that "the chains were undone" and knowing of the instructions to "[a]lways have someone holding up the piece that you are taking down"? Our case law provides some guidance in answering that question.

¶ 26. Where there is a written law or policy defining a duty, we naturally look to the language of the writing to evaluate whether the duty and its parameters are expressed so clearly and precisely, so as to eliminate the official's exercise of discretion.

¶ 27. For example, in *Meyer,* 271 Wis. at 331, the issue was whether injured students could recover from school board officials, in their individual capacities, for failure to erect guardrails or other safety devices in a retaining wall. We assessed statutory language that officials had a duty to "keep the buildings and grounds in good repair, suitably equipped and in safe and sanitary condition at all times," and concluded that that language did not create a ministerial duty. As we explained:

> [A] great many circumstances may need to be considered in deciding what action is necessary to do so, and such decisions involve the exercise of judgment or discretion rather than the mere performance of a prescribed task.

*Id.* at 331–32.

¶ 28. Similarly, in *Lodl,* we looked at a statute and a police department policy to determine whether those materials created a ministerial duty for officers to control traffic manually when responding at an intersection where traffic signals were inoperable.[12] 253

---

[12] The court in *Lodl* assessed whether a ministerial duty was present within the framework of the known danger exception. Although that exception is different from the ministerial duty exception, there is an overlap between the two exceptions, as we have noted. In any event, our assessment in *Lodl* of the known danger exception does not differ markedly from how we have generally assessed the duty under the ministerial duty exception.

Wis. 2d 323, ¶ 27. We noted, first, that the relevant statute mandated a series of whistle signals that an officer must use when directing traffic; however, the statute did not require an officer to perform manual traffic operation in a given situation, nor did it strip an officer of discretion to determine when to effectuate manual control. *Id.*, ¶ 27.

¶ 29. Likewise, in *Lodl,* the language of the police department policy on operations and procedures was not ministerial, where the language merely provided suggestions for an officer to follow when manually controlling traffic. The policy did not mandate when or whether an officer should undertake such control. Moreover, it was significant to this court that (1) the police chief described the policy as merely "guideline[s]"; (2) other language in the manual stated that officers are expected to use their judgment in addressing problems; and (3) the language of the policy paragraph at issue used the discretionary word "should" throughout. *Id.*, ¶¶ 29–30. Similarly, in *Noffke v. Bakke,* 2009 WI 10, 315 Wis. 2d 350, 760 N.W.2d 156, we assessed language in "spirit rules" governing responsibilities for cheerleading coaches to determine whether those rules imposed a ministerial duty. We concluded that the rules did not impose such a duty, based in part on language describing the rules as "guidelines," "a useful reminder of basic procedures," and other permissive language such as "should" (rather than a mandatory "must" or "shall") throughout. *Id.*, ¶ 46.

¶ 30. Indeed, the choice of discretionary versus mandatory language is a significant factor in determining the existence of a ministerial duty. For example, in *Chart v. Dvorak,* 57 Wis. 2d 92, 203 N.W.2d 673 (1973), where the failure alleged was improper placement of a highway warning sign, we assessed several statutory

provisions as well as a State Highway Commission (commission) manual. We assessed statutory language stating that the commission "*shall* erect and maintain" guide and warning signs "as it deems necessary" and that "[n]o . . . sign . . . *shall* be installed unless the design, installation and use or operation of such sign . . . conforms to the rules of the . . . commission." *Id.* at 99 n.5. (Emphasis added.) We understood that language to mean that although the commission had discretion as to whether to place the signs at all (i.e., "as it deems necessary"), once officials decided to place a particular sign, workers were bound by a duty to erect and maintain that sign in conformance with commission-developed directives. Accordingly, those directives were "absolute, certain and imperative" and set forth a ministerial duty once a decision was made to place a sign, and the defendants' negligent failure to comport with the relevant directives would not be protected by governmental immunity.

¶ 31. Our first task in this case is to identify a source of law or policy imposing a ministerial duty on McMillon. Although we have not expressly defined what manner of "law" is sufficient in this context to serve as a source for a ministerial duty, we have traditionally assessed a wide variety of materials to determine whether a ministerial duty existed. *See, e.g., Bicknese,* 260 Wis. 2d 713, ¶ 25 (evaluating employee policy manual); *Lodl,* 253 Wis. 2d 323, ¶¶ 28–30 (reviewing police department operations policy); *Kimps,* 200 Wis. 2d at 14–15 (assessing employee job description). Moreover, the court of appeals has understood "law" in this context to encompass a relatively broad, but not limitless, spectrum of materials. *See Meyers v. Schultz,* 2004 WI App 234, ¶ 19, 277 Wis. 2d 845, 690 N.W.2d 873 (concluding that manufacturers' instruc-

tions that the governmental unit did not create and that did not establish a contractual obligation by the entity was not "an act of government" that could satisfy the minimal requirements of a law or policy for purposes of the ministerial duty exception).

¶ 32. Here, the take-down instructions fall within the range of documents that could serve as a basis for a ministerial duty. Both Hedden and Jaeger provided testimony that the procedures were State Fair Park documents and created by State Fair Park staff for use in State Fair Park work. Moreover, Hedden, Jaeger, and McMillon all acknowledged that the procedures set forth the steps required by State Fair Park employees to take down the stalls safely. Accordingly, we are satisfied that the set of procedures is a source of "law" for purposes of establishing a ministerial duty.

¶ 33. We now return to the central inquiry here: Did the instructions establish a ministerial duty that McMillon then violated when he jumped on and shook the stuck stall knowing that "the chains were undone" and knowing of the instructions to "[a]lways have someone holding up the piece that you are taking down"? We are satisfied that the instructions created such a ministerial duty and that McMillon violated that duty based on the following reasons.[13]

---

[13] We strongly disagree with the dissent's assertions that, by holding that a ministerial duty is present here, we depart from precedent and abandon our courts' "time-tested approach" to assessing the limited ministerial duty exception. *See* Justice Bradley's dissent, ¶¶ 48, 50. We do no such thing. Rather, we reach our holding by applying the law as this court has developed it over the last fifty years to the facts and circumstances

¶ 34. First and foremost, the language in the written instructions for the take-down procedure in section 6(a) has the requisite specificity and definition of the "time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Lister,* 72 Wis. 2d at 301. As we noted above, the instructions require workers taking down stall pieces to *"[a]lways* have someone holding up the piece that you are taking down." (Emphasis added.) That instruction may be brief, but it is significant. The word "always" imparts a mandatory requirement, unlike discretionary words such as "may" or "should." "Always" does not permit discretion as to whether to have workers hold up the piece being taken down. Rather, it requires workers to ensure that the pieces are secured from falling during the take-down process. In other words, just as the language of the highway commission manual in *Chart* foreclosed the possibility that workers could place highway signs in a location that did not conform to the rules, the instructions here definitively proscribe attempting to take down pieces of a stall without those pieces being secured during that process.

¶ 35. Furthermore, testimony supports our conclusion that the take-down requirement to "[a]lways have someone holding up the piece that you are taking down" defines the "time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." McMillon testified that the instructions provided the steps to be taken in the take-

_____

presented in this case and record. Based on that exercise, we are satisfied that a narrow ministerial duty exists here.

Accordingly, we dispute the dissent's unfounded concerns that our holding here expands—to any degree—the narrow ministerial duty exception to immunity that state and local governments have been subject to for the last half century.

down process, and that he was required to follow those instructions "every single time" he took down stalls. Moreover, Jaeger testified that, although some discretion was permitted to State Fair Park employees to do their jobs, it was a violation of State Fair Park procedure to leave the stall sections unsecured.

¶ 36. Those circumstances are distinguishable from the facts in *Lodl,* where the police chief testified to the importance of permitting officers discretion in performing their jobs, and where the policy had discretionary language such as "should" throughout. *Lodl,* 253 Wis. 2d 323, ¶ 29; *see also Noffke,* 315 Wis. 2d 350, ¶ 46 (noting that permissive language and use of the word "should" in spirit rules suggested that the rules at issue permitted discretion). Here, the circuit court made the following findings of fact:

> According to defendant McMillon's deposition, the same dismantling process is followed each time; the employees do not have the ability to change the process; the only acceptable way to dislodge the walls is to use a hammer rather than jump on top of the walls; the stalls have to be put up and taken down in a certain manner or there is a danger of someone being hurt.

(Citations to the record omitted). Those findings are not clearly erroneous, and we agree with the circuit court that those findings compel the conclusion that McMillon knew of the proper take-down procedures pursuant to the instructions, and that he understood he was required to follow those instructions every time he disassembled the stalls.

¶ 37. In addition to the mandatory language to "[a]lways have someone holding up the piece that you are taking down" and McMillon's understanding that he was to follow the instructions "every time" he dis-

mantled the stalls, the nature of the work and the context in which it is performed support our conclusion that instruction section 6(a) creates a ministerial duty for State Fair Park employees. According to instruction section 1(a), at least four people are required to set up the stalls. Moreover, testimony at trial established that each steel piece was large (10 feet by 10 feet), weighed approximately 200 pounds, and required four people to lift it. Put differently, the take-down process involves multiple workers and volunteers—at least some of whom do not have experience with the equipment or procedures involved—moving large, heavy, awkward equipment used at least annually at State Fair Park events. In light of that, the presence of instructions imparting a nondiscretionary set of procedures is a necessity. As the circuit court noted, "[D]isassembling horse stalls is a process that can, and should, be controlled with set guidelines so as to preserve equipment and prevent injury, workers are not given discretion as to performing disassembly." Those circumstances support the conclusion that the instruction in section 6(a) is not discretionary but is purely ministerial.

¶ 38. Moreover, that purely ministerial duty encompasses a proper use of chains during the disassembly process. As the court of appeals observed, it is undisputed that the stalls are made up of four separate pieces: a front, two sides, and a back, with the sides and back pieces each chained to a wall to prevent those pieces from falling when workers removed the pins attaching the pieces together. It is also undisputed that the proper method of disassembling the stalls is to first remove the front by removing the pins and lifting that piece, then each side one at a time by again removing the pins and removing the chains while workers hold the piece up, and finally the back by removing the chain, with the

workers again holding it up to prevent it from falling. Additionally, both McMillon and Jaeger provided testimony explaining the chains' important role in the stall disassembly process. Further, Jaeger stated in his deposition that removing chains from stall pieces other than the pieces the workers are moving is a violation of procedure. Accordingly, we understand the precaution of securing the side and back pieces with chains is logically encompassed within the literal instruction to "[a]lways have someone holding up the piece that you are taking down." Thus, the ministerial duty here requires employees to ensure that the pieces they are taking down are secured.[14]

¶ 39. Given that ministerial duty to ensure that the stall pieces were secure from falling and McMillon's awareness of that duty, we also are satisfied that McMillon violated that duty here. Although this record

---

[14] Neither part 6(a) nor the remainder of the instructions refer to the chains or designate their proper use. That omission would be problematic if our analysis of the ministerial duty exception required us to look strictly at the language of the policy. Our assessment is not so limited. Review of whether a policy contains a ministerial duty focuses on the text of the relevant policy or rule and its nature. However the context in which the policy is used and the circumstances of the case are relevant considerations that can support or negate a conclusion that policy language creates a ministerial duty. *Compare, e.g., Bicknese,* 260 Wis. 2d 713, ¶¶ 27–30 (looking to mandatory language of policy as well and employee's acknowledgement and understanding that he was subject to the duties) *with Lodl,* 253 Wis. 2d 323, ¶¶ 24–34 (looking to permissive language and testimony stating that policies were only guidelines to determine that no ministerial duty existed). Here, we are satisfied that all of those considerations, taken together, establish a ministerial duty to ensure that stall pieces are secured by chains or by "someone holding up the piece that you are taking down."

makes it difficult to discern where the inmates were positioned and what else was happening when McMillon jumped on the stalls, Pries testified that he was standing near "the end of" a piece when McMillon jumped on the stalls. Moreover, given that falling stall pieces hit all three of the inmates indicates that they were standing well within the trajectory of the unsecured pieces. The most relevant testimony came from McMillon, who stated that before the stalls fell, he saw that the chains were removed and that "no one was holding up the stall sections." That testimony came in the context of McMillon's denial that he was not near the stalls when the sections fell, a denial that the circuit court appears to have found to be incredible. It is worth noting, however, that it was McMillon's denial, not some of his other specific observations, that the court found incredible.

¶ 40. Furthermore, the record clearly supports the conclusion that McMillon was aware that the chains were undone on the back piece. In testimony that the circuit court found to be credible, Pries testified that McMillon stated that the chains were off—and should not have been removed—before jumping on the stall. Accordingly, McMillon was aware that those pieces were unsecured, that the inmates were standing nearby, and that the unsecured pieces could cause injury if they fell. Because he did not take the steps required, before attempting to dislodge the stuck stall piece, to ensure that any unsecured pieces were properly secured, he failed to comport with the ministerial duty established in section 6(a) of the take-down instructions. Accordingly, the ministerial duty applies and governmental immunity is not available as a defense for him under the circumstances presented here.

¶ 41. Because we conclude that the ministerial duty exception applies here, it is not necessary for us to determine whether the known danger exception also applies. Moreover, we decline the invitation extended by Pries' counsel to revisit *Holytz* and resurrect its general rule. That question was not fully briefed or argued by the parties. Moreover, it is unnecessary for us to undertake such an analysis and case law review given our conclusion that the ministerial duty exception to governmental immunity applies here. *See Stoughton Trailers, Inc. v. LIRC*, 2007 WI 105, ¶ 5 & n.3, 303 Wis. 2d 514, 735 N.W.2d 477 (explaining that we decide cases on the narrowest grounds).

## IV. CONCLUSION

¶ 42. We affirm, although on different grounds than the court of appeals. We are satisfied that, under the circumstances presented here, the ministerial duty exception to governmental immunity applies. Specifically, State Fair Park instructions to "[a]lways have someone holding up the piece that you are taking down" created a ministerial duty that McMillon violated when he failed to ensure that the stall pieces were secured. Hence, McMillon is not protected by a defense of governmental immunity, and is liable for his negligent acts that caused injury to Pries.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 43. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). I agree with the majority opinion that Raymond McMillon is not immune from liability. Although I go along with the majority's ministerial duty analysis, I write separately because I conclude that the known

64

danger analysis upon which the Court of Appeals resolved this case provides a simpler, and to me, a more persuasive means of resolving this case.[1]

¶ 44. The known danger reasoning in our precedent establishes that where "the nature of the danger is compelling and known to the officer and is of such force that the public officer has no discretion not to act," a ministerial duty arises.[2]

¶ 45. The seminal case explaining the known danger rationale is *Cords v. Anderson,* 80 Wis. 2d 525, 259 N.W.2d 672 (1977), in which the court concluded that a park trail's obvious drop-offs and location within a foot of the edge of a high bluff were sufficiently dangerous to give rise to the park manager's "absolute, certain, and imperative duty" to close the trail, place warning signs, notify his superiors, or otherwise ensure adequate protection of the public who had been invited to use the park. 80 Wis. 2d at 532, 539, 541.[3] The court held that the manager was liable for breach of that absolute duty,

---

[1] The circuit court, like the majority, concluded that the "ministerial duty" analysis applied.

[2] *C.L. v. Olson,* 143 Wis. 2d 701, 715, 422 N.W.2d 614 (1988).

[3] *See also Domino v. Walworth County,* 118 Wis. 2d 488, 490–91, 347 N.W.2d 917 (Ct. App. 1984) (holding the known danger analysis from *Cords* applied where the sherriff's dispatcher knew of a downed tree across a road at night but failed to reassign a squad car to the scene after the first response was diverted); *Voss ex rel. Harrison v. Elkhorn Area Sch. Dist.,* 2006 WI App 234, ¶¶ 19–22, 297 Wis. 2d 389, 724 N.W.2d 420 (holding that "the known and present danger exception applies" where a teacher had students wear "fatal vision goggles" that distort vision and sense of balance in a classroom filled with metal desks created an immediate risk of injury; "it should have been self-evident to the teacher that the activity was hazardous and the only option was to put an end to it.").

saying "There comes a time when 'the buck stops,' " and set aside immunity where the manager "knew the terrain . . . was dangerous particularly at night; . . . was in a position as park manager to do something about it; . . . [and] failed to do anything about it." 80 Wis. 2d at 541.[4]

¶ 46. The *Cords* analysis is fully applicable in the present case. The pieces of solid steel horse stalls weigh 200 pounds, are typically handled by no less than four workers, and need to be constantly supported during disassembly. Disassembly here is an "accident waiting to happen"[5] and gives rise to an absolute duty to take steps to prevent the steel horse stall pieces from falling. McMillon knew the unchained steel stall pieces were dangerous; he was in a position as supervisor to do something about the danger; and he failed to do anything about it—worse, he jumped onto the stalls.[6] In

---

[4] The availability of several possible ways to fulfill an absolute duty arising from a known danger does not bring a defendant within the scope of governmental immunity. *See Domino v. Walworth County*, 118 Wis. 2d 488, 491, 347 N.W.2d 917 (Ct. App. 1984) ("[S]imply allowing for the exercise of discretion does not suffice to bring the actions under the blanket of immunity provided by sec. 893.80(4), Stats., when the facts or the allegations reveal a duty so clear and absolute that it falls within the concept of a ministerial duty.").

For a discussion of the known danger exception, *see also Lodl v. Progressive N. Ins. Co.*, 2002 WI 71, ¶¶ 32–48, 253 Wis. 2d 323, 646 N.W.2d 314; *id.* at ¶¶ 53–60 (Bradley, J., dissenting).

[5] *See Voss*, 297 Wis. 2d at 398.

[6] The circuit court found that McMillon "was aware the chains were undone, . . . was aware that inmates were standing next to the stuck stall," and "knew that if the chains holding those back stalls to the wall had been removed, they could fall." *Pries v. McMillon*, 2008 WI App 167, ¶¶ 23–24, 314 Wis. 2d 706, 760 N.W.2d 174.

my view, he thereby breached a duty that was "absolute, certain, and imperative" following the analysis of the known danger cases. Accordingly, an immunity defense is not available to him.

¶ 47. For the foregoing reasons, I concur.

¶ 48. ANN WALSH BRADLEY, J. (*dissenting*). Today's decision expands the liability of public officers far beyond the confines established by more than a half-century of precedent. The result of this expansion could expose not only the Wisconsin State Fair Park to liability, but also villages, towns, cities, school boards, and other state and local government treasuries at a time when these entities can least afford it.

¶ 49. Just last term, we reaffirmed the narrow definition of ministerial duty and recognized that "[t]he definition of ministerial duty has remained substantially the same since it was adopted in 1955[.]" *Umansky v. Fox,* 2009 WI 82, ¶ 11, 319 Wis. 2d 622, 769 N.W.2d 1 (citing *Meyer v. Carman,* 271 Wis. 329, 73 N.W.2d 514 (1955)). A ministerial duty imposed by law is an "absolute, certain and imperative duty." *Lister v. Board of Regents,* 72 Wis. 2d 282, 301, 240 N.W.2d 610 (1976). It involves "the performance of a specific task" when the law "defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Id.*

¶ 50. To determine whether a public officer or employee can be held liable, courts have always looked to the written language of the relevant statute, regulation, policy, or procedure to see if it fits within the very limited ministerial duty exception to immunity. *See, e.g., Bicknese v. Sutula,* 2003 WI 31, ¶¶ 27–28, 260 Wis. 2d 713, 660 N.W.2d 289; *Lodl v. Progressive N. Ins.*

*Co.*, 2002 WI 71, ¶¶ 27–28, 253 Wis. 2d 323, 646 N.W.2d 314. Today, however, the majority abandons this time-tested approach.

¶ 51. Tucked away in a footnote, the majority explains that it is untethering its analysis from the language of the relevant written procedure. Majority op., ¶ 38 n.14. Instead it analyzes and relies on the extraneous opinions of coworkers about how to safely perform the job.

¶ 52. The problem with relying on the opinions of coworkers to inform the nature of the ministerial duty is two-fold: (1) the majority essentially rewrites the text, expanding the duties beyond those found in the written procedure; and (2) it conflates the analysis of negligence with the ministerial duty immunity defense. Both the writing in of ministerial duties beyond those that appear in the text and the conflation of negligence with immunity will result in diminished governmental immunity and increased exposure of all levels of government to costly lawsuits.

¶ 53. I conclude that there is another way to resolve this case. In examining the text of the take-down procedure, I determine that the procedure suffers from a critical lack of particularity as to time, mode and occasion for performance. The written procedure is not sufficiently particularized to remove McMillon's discretion as he faced the dilemma of what to do when the stalls became stuck together. Accordingly, I respectfully dissent.

I

¶ 54. The majority begins by examining the language and parameters of the take-down procedure. Majority op., ¶ 26. The written procedure provides:

68

"Always have someone holding up the piece that you are taking down."[1] Initially focusing on the language of that instruction, the majority determines that the word "always" imparts a mandatory requirement. *Id.*, ¶ 34.

¶ 55. The majority apparently recognizes that the written procedure is insufficiently particularized to impose a ministerial duty. It departs from the language of the instruction and examines instead testimony of State Fair Park employees about their understanding of their duties. *Id.* ¶ 38 & n.14. Although the written take-down procedure does not mention chains or discuss their proper use, the majority concludes that the "purely ministerial duty encompasses a proper use of chains." *Id.*, ¶ 38.

¶ 56. Ultimately, the majority appears to conclude that the written procedure does not mean what it says. Although the written procedure provides that McMillon should "[a]lways have someone holding up the piece that [he is] taking down," the majority determines that actually, McMillon need not always have someone holding up the piece that he is taking down. Rather, according to the majority, McMillon could choose between securing the stalls by having someone hold them up or securing the

---

[1] Section 6 sets forth the entire written take-down procedure. It provides in full:

a. Always have someone holding up the piece that you are taking down.

b. Take out the top pins on the top of the stall piece and then lift the stall piece off the bottom pins.

c. The sides can be stacked horizontally with 15 to a stack.

d. Fronts must be stored vertically, if possible put in storage racks.

e. Make sure all of the pins are picked up and put into the storage box. (These can not be lost)

stalls with chains—as long as McMillon "ensure[s] that the stall pieces [are] secure from falling." *Id.*, ¶ 39, ¶ 38 n.14.

A

¶ 57. By untethering its analysis from the language of the written procedure, the majority departs from our established approach. Although courts have reviewed employee testimony to confirm that an employee is responsible for complying with the text of a specific statute, regulation, or procedure, they have not used testimony to change the meaning of that text, as the majority does here.

¶ 58. To determine whether there is a ministerial duty, we have always examined the language of the applicable statute, regulation, or procedure. *See, e.g., Bicknese,* 260 Wis. 2d 713, ¶¶ 27–28 (examining the "clear mandate" of § 7.04 of the University of Wisconsin Faculty Policies and Procedures, which set forth the procedure for calculating tenure clocks); *Lodl,* 253 Wis. 2d 323, ¶¶ 27–28 (examining the text of Wis. Stat. § 346.40 and the Town of Pewaukee Police Department's Operations Policy).

¶ 59. In the past, we have referenced employee testimony to confirm that an employee was required to adhere to the text of a statute, regulation, or procedure. *See, e.g., Bicknese,* 260 Wis. 2d 713, ¶ 27 (discussing an employee's admission that one of his job duties was to calculate tenure clock according to the terms of § 7.04 of the University of Wisconsin Faculty Policies and Procedures); *Lodl,* 253 Wis. 2d 323, ¶¶ 29–30 (concluding that the Operations Policy set forth a guideline rather than a ministerial duty, relying in part on the drafter's statement that he could not sit in his office and dictate the best way for officers to do their many jobs).

¶ 60. However, we have not used employee testimony as the majority does here—to alter and expand the meaning of the text, adding new duties that cannot be found in the text of the procedure. Compare the duty identified by the majority—"ensure that the stall pieces [are] secure from falling"—with the text of the procedure, which provides that McMillon must "have someone holding up the piece that [he is] taking down."

¶ 61. Because the majority uses employee testimony to alter and expand the meaning of the text, the ministerial duty identified by the majority is much broader than any duty identified in the text of the take-down procedure. Under the majority's analysis, it would appear that McMillon has violated a ministerial duty any time that the stalls fall, regardless of whether he was adhering to the text of the written take-down procedure.

¶ 62. The result of the majority's innovation is an expansion of liability. By relying on sources extraneous to the text of the relevant law, it broadens the scope of duties that may be considered ministerial duties imposed by law. As a result, more duties will be considered ministerial in nature, increasing the exposure of state and municipal treasuries.

B

¶ 63. Further, by focusing on the testimony of employees and the circumstances of the case, the majority conflates the standards for negligence and immunity. Negligence and immunity are separate inquiries. "The immunity defense assumes negligence, focusing instead on whether the municipal action (or inaction) upon which liability is premised is entitled to immunity under

the statute, and if so, whether one of the judicially-created exceptions to immunity applies." *Lodl,* 253 Wis. 2d 323, ¶ 17.

¶ 64. "[O]ne has a duty to exercise ordinary care under the circumstances." *Hoida, Inc. v. M&I Midstate Bank,* 2006 WI 69, ¶ 30, 291 Wis. 2d 283, 717 N.W.2d 17. If a person acts or fails to act in a way "that a reasonable person would recognize as creating an unreasonable risk of injury or damage," that person "is not exercising ordinary care under the circumstances, and is therefore negligent." *Id.*

¶ 65. Unlike the duty of ordinary care, a ministerial duty imposed by law is an "absolute, certain and imperative" duty. *Lister,* 72 Wis. 2d at 301. It involves "the performance of a specific task" when the law "defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Id.* "Just because a jury can find that certain conduct was negligent does not transform that conduct into a breach of a ministerial duty." *Kimps v. Hill,* 200 Wis. 2d 1, 11, 546 N.W.2d 151 (1996).

¶ 66. A State Fair Park employee's testimony about how to safely perform his job may be relevant in determining whether McMillon was negligent for failing to use ordinary care. Such testimony could inform the factfinder's determination of whether a reasonable person would recognize that McMillon's actions or inactions would create an unreasonable risk of injury.

¶ 67. However, the same testimony is not relevant in identifying a ministerial duty. An opinion of an employee about how to safely perform his job does not create a duty that is "absolute, certain and imperative."

¶ 68. By conflating the standards for negligence and immunity, I am concerned that the majority opinion could be understood to hold that an officer who fails

to exercise ordinary care has violated a ministerial duty. Such a departure from established law would broaden the narrow ministerial duty exception to encompass all cases involving negligence of public officers. Again, this expansion of the exception would result in increased liability for public officers and increased exposure for public treasuries.

## II

¶ 69. Contrary to the majority, when I examine the take-down procedure here, I conclude that it does not impose a ministerial duty. To fit within the exception, the law imposing a duty must be both mandatory and highly particularized. "[F]or a duty to be ministerial, a public officer must be not only bound to act, but also bound by law to act in a very particular way, leaving nothing for judgment or discretion." *Yao v. Chapman,* 2005 WI App 200, ¶ 29, 287 Wis. 2d 445, 705 N.W.2d 272.

¶ 70. Just last term, we applied this standard in a case involving a death at Camp Randall stadium. *See Umansky,* 319 Wis. 2d 622. In that case, the plaintiff fell to his death while working on an unguarded platform located eight feet above ground. Umansky's estate argued that the director of facilities was required under the Wisconsin Administrative Code to adhere to an OSHA regulation, which mandated railings on all platforms located more than four feet above ground.

¶ 71. The regulation in *Umansky* was "highly specific." *Id.,* ¶ 18. It stated: "Every open-sided floor or platform 4 feet or more above adjacent floor or ground level shall be guarded by a standard railing (or the equivalent as specified in paragraph (e)(3) of this section) on all open sides except where there is entrance to

73

a ramp, stairway, or fixed ladder. . . ." *Id.*, ¶ 6. It further provided specifications for a standard railing:

> A standard railing shall consist of top rail, intermediate rail, and posts, and shall have a vertical height of 42 inches nominal from upper surface of top rail to floor, platform, runway, or ramp level. The top rail shall be smooth-surfaced throughout the length of the railing. The intermediate rail shall be approximately halfway between the top rail and the floor, platform, runway, or ramp. The ends of the rails shall not overhang the terminal posts except where such overhang does not constitute a projection hazard.

*Id.*, ¶ 16 n.8.[2]

¶ 72. We agreed with and adopted the court of appeals' conclusion that "[t]he duty to have a railing meeting the regulation's requirements is imposed by law, it is absolute, certain and imperative, and it requires performance in a specified manner and upon specified conditions that are not dependent upon the exercise of judgment or discretion." *Id.*, ¶¶ 3–4, 17. As the court of appeals had explained, "[i]t is the mandatory and specific nature of the duty the government has chosen to impose that triggers the expectation that the duty will be carried out and the concomitant imposition of liability if it is

---

[2] The regulation also provided specifications for an equivalent rail: "Other types, sizes, and arrangements of railing construction are acceptable provided they meet the following conditions: (a) A smooth-surfaced top rail at a height above floor, platform, runway, or ramp level of 42 inches nominal; (b) A strength to withstand at least the minimum requirement of 200 pounds top rail pressure; (c) Protection between top rail and floor, platform, runway, ramp, or stair treads, equivalent at least to that offered by a standard intermediate rail . . . ." *Umansky v. Fox,* 2009 WI 82, ¶ 16 n. 9, 319 Wis. 2d 622, 769 N.W.2d 1.

not." *Umansky v. ABC Ins. Co.*, 2008 WI App 101, ¶ 35, 313 Wis. 2d 445, 756 N.W.2d 601.

¶ 73. By contrast, in *Yao*, 287 Wis. 2d 445, a regulation that contained mandatory language nevertheless lacked the requisite particularity to impose a ministerial duty. In that case, a researcher stored his cells in a nitrogen tank at a university laboratory. The cells were destroyed when a professor permitted students to access the tank without providing training or instruction. *Id.*, ¶ 23. Yao introduced evidence that one of the students replaced the lid improperly, allowing the liquid nitrogen to evaporate. *Id.*

¶ 74. The Wisconsin Administrative Code mandates that laboratory employers ensure that their employees are properly trained to work with chemical cryogenics such as liquid nitrogen. *Id.*, ¶ 30. The regulation states that employers "shall provide employees with information and training to ensure that they are apprised of the hazards of chemicals present in their work area," and "[s]uch information shall be provided at the time of the employee's initial assignment[.]" *Id.*, ¶ 31.

¶ 75. Although the regulation contained mandatory language, the court concluded that it "suffer[ed] from a critical lack of particularity as to time, mode and occasion for [] performance." *Id.*, ¶ 31. The court explained: "The standards say nothing about access to or control of a liquid nitrogen tank, how or how often to determine whether the liquid nitrogen level is sufficient, how to replenish the liquid nitrogen when it becomes necessary to do so, or how to properly open and refasten the tank lid." *Id.*, ¶ 32.

¶ 76. *Umansky* and *Yao* make clear that mandatory language in a regulation is not enough to impose a ministerial duty. In addition to mandatory language,

75

the regulation must be sufficiently particularized so that there is nothing left to the officer's discretion about where, when, and how to perform the duty.

¶ 77. Here, although the take-down procedure contains the word "always," I conclude that the procedure suffers from a critical lack of particularity as to time, mode and occasion for performance. The written procedure is not sufficiently particularized to remove McMillon's discretion and impose a duty that is purely ministerial. It does not describe how many workers are necessary to hold up a stall piece. It does not describe when and where those workers should be positioned. Rather, it provides more particularity about how to ensure that the stalls are properly stored to prevent loss or damage than it does about how to prevent injury when dismantling the stalls.

¶ 78. Critically, the procedure does not mention the use of chains, much less prescribe their use with such particularity that nothing is left to discretion or judgment. How many chains are need to safely secure a stall? Should chains be used at all times, or only after the top pins have been removed? Should the chains remain attached while the workers are lifting a particular stall piece off the bottom pins, or must the chains be removed before that time?

¶ 79. Finally, the procedure does not specify what an employee should do if the stalls become stuck together, as occurred in this case. Rather, the procedure does not seem to contemplate that the stalls could become stuck.

¶ 80. Because of the gaps in the procedure, an employee necessarily must use discretion in how best to dismantle the stalls. As a result, I conclude that the written procedure does not delineate a duty that is "absolute, certain and imperative, involving merely the

76

performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion."

## III

¶ 81. In *Scott v. Savers Property & Casualty Insurance Co.*, we acknowledged that governmental immunity could produce harsh results, especially when the negligence of a public officer "was so clear." 2003 WI 60, ¶ 37, 262 Wis. 2d 127, 663 N.W.2d 715. "Yet," we concluded, "the doctrine of governmental immunity plays a significant role in our legal system. Imposing liability in this case would therefore not serve the policy underlying the doctrine of immunity."[3] *Id.*

¶ 82. Over the years, we have adhered to a consistent approach to governmental immunity. In *Umansky*, for example, the injured plaintiff argued that we "should repudiate the current formulation of public officer immunity."[4] We rejected the argument and declined to alter longstanding law. *Id.*, ¶ 14 n.6.

¶ 83. Similarly, in *Scott*, we declined to alter our approach to municipal officer immunity. 262 Wis. 2d 127, ¶¶ 34–37. Writing in concurrence, the Chief Justice explained that "construing governmental immunity anew [would] have a far-reaching impact, and this court should only undertake such a task with the benefit of full information." *Id.*, ¶ 59 (Abrahamson, C.J., concurring). Unfortunately, the majority's approach construes

---

[3] One of the public policies underlying immunity is protecting the public purse and taxpayers against liability for money damages. *See Lodl v. Progressive N. Ins. Co.*, 2002 WI 71, ¶ 23, 253 Wis. 2d 323, 646 N.W.2d 314.

[4] Response Brief of Harold Umansky at 11, *Umansky*, 319 Wis. 2d 622, ¶ 11 (available at the Wisconsin Law Library).

immunity anew without even acknowledging that it is doing so. For the reasons set forth above, I respectfully dissent.

¶ 84. I am authorized to state that Justices PATIENCE DRAKE ROGGENSACK and MICHAEL J. GABLEMAN join this dissent.

¶ 85. MICHAEL J. GABLEMAN, J. (*dissenting*). Justice Bradley's dissent ably demonstrates that the ministerial exception does not apply under our existing case law. I join it in full. I write separately, however, because our case law is, troublingly, untethered from the governing statute, Wis. Stat. § 893.80(4) (2007–08).[1]

¶ 86. Governmental immunity has its roots in the common law. This court abrogated the prior rule of immunity in *Holytz v. City of Milwaukee,* 17 Wis. 2d 26, 115 N.W.2d 618 (1962). We made clear that in regard to municipalities, going forward, "the rule is liability—the exception is immunity." *Id.* at 39. We outlined an exception to immunity, however, stating that a government body is not liable for actions done "in the exercise of its legislative or judicial or quasi-legislative or quasi-judicial functions." *Id.* at 40. If the legislature disagreed with this new approach, we noted, "it is, of course, free to reinstate immunity." *Id.*

¶ 87. In the year following our decision in *Holytz,* the legislature waded into this area in a comprehensive way for the first time. It created a new statute essentially codifying our language in *Holytz.* The current version of the statute provides as follows:

> No suit may be brought against any volunteer fire company organized under ch. 213, political corporation, governmental subdivision or any agency thereof for the

---

[1] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

intentional torts of its officers, officials, agents or employees nor may any suit be brought against such corporation, subdivision or agency or volunteer fire company or against its officers, officials, agents or employees for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions.

Wis. Stat. § 893.80(4).

¶ 88. The context of this statute's adoption and its plain language suggest that liability should be the rule, and that suits are generally barred under only two circumstances.[2] First, the statute bars suits against the listed governmental bodies "for the intentional torts of [their] officers, officials, agents or employees." Second, it bars suits against the listed governmental bodies and employees "for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions."

¶ 89. Reading this statute, one might surmise that, where the claim did not involve an intentional tort, our cases would center on whether the allegedly harmful acts were legislative, quasi-legislative, judicial, or quasi-judicial in nature. Yet, this is not the reality.

¶ 90. In the years following the legislature's proclamation in 1963, this court has interpreted this subsection to mean that the listed government officials are entitled to immunity for any acts that involve "the exercise of discretion and judgment." *Lodl v. Progressive N. Ins. Co.,* 2002 WI 71, ¶ 21, 253 Wis. 2d 323, 646

----

[2] I say "generally" because the legislature has granted immunity in other specific factual scenarios. *See, e.g.,* Wis. Stat. § 301.46(7) (granting immunity "for any good faith act or omission regarding the release of information" concerning sex offenders under that section); Wis. Stat. § 30.2026(5) (granting immunity "for acts or omissions that cause damage or injury and that relate to the construction, maintenance, or use of any artificial barrier" authorized by § 30.2026(1)).

N.W.2d 314. Now, instead of adhering to the letter and spirit of the statute—which specifies exceptions to the rule of *liability,* we have created a series of common law exceptions to *immunity. See* majority op., ¶¶ 21–24. This court has recognized that its current doctrines in this area are, in effect, public policy judgments; they are the product of the court's attempt to balance competing societal interests. *Lodl,* 253 Wis. 2d 323, ¶¶ 23–24. We seem to have dispensed with the notion that the text of the statute should be our guide. Something here is amiss.[3]

¶ 91. Seven years ago, Justice Prosser issued a call for this court to reexamine its jurisprudence in this area.[4] *See Scott v. Savers Prop. & Cas. Ins. Co.,* 2003

---

[3] The United States District Court for the Western District of Wisconsin also recognized this in *Baumgardt v. Wausau Sch. Dist. Bd. of Educ.,* 475 F. Supp. 2d 800 (W.D. Wis. 2007). Judge Crabb observed:

> On its face the immunity granted under [Wis. Stat. § 893.40(4)] appears limited. *Holytz v. City of Milwaukee,* 17 Wis. 2d 26, 39, 115 N.W.2d 618 (1962) (first setting forth test now codified in Wis. Stat. § 893.80(4) and noting "the rule is liability—the exception is immunity"). However, in a *curious and expansive exercise of statutory construction,* the Wisconsin courts have interpreted § 893.80(4) to mean that government officials are entitled to immunity for "any act that involves the exercise of discretion and judgment." *Lodl v. Progressive Northern Insurance Co.,* 2002 WI 71, ¶ 21, 253 Wis. 2d 323, 646 N.W.2d 314 (2002). Currently, there are four narrow categories of non-discretionary acts to which immunity does not apply: "(1) ministerial duties imposed by law, (2) duties to address a known danger, (3) actions involving professional discretion, and (4) actions that are malicious, willful, and intentional." *Scott v. Savers Property and Casualty Insurance Co.,* 2003 WI 60, ¶ 16, 262 Wis. 2d 127, 663 N.W.2d 715 (2003). *Thus, it appears that immunity is now the rule in Wisconsin rather than the exception.*

*Id.* at 809 (emphasis added).

[4] This call to reexamine our approach was echoed in a concurrence written by Justice Bablitch and joined by Justice

WI 60, ¶¶ 75–82, 262 Wis. 2d 127, 663 N.W.2d 715 (Prosser, J., dissenting).[5] I now join this call. My concern is rooted in the rule of law. The legislature has chosen to address the issue of governmental immunity directly. When the legislature has spoken, our obligation is to follow its intentions as expressed in the Wisconsin Statutes. Our current case law has strayed from this constitutional duty.

¶ 92. In short, though I agree with Justice Bradley's dissent that liability here is not warranted under our existing case law, I am not satisfied that our cases faithfully interpret § 893.80(4), and urge my colleagues to reconsider our jurisprudence to more closely align it with the legislative mandate.

---

Crooks. *See Scott v. Savers Prop. & Cas. Ins. Co.*, 2003 WI 60, ¶¶ 61–64, 262 Wis. 2d 127, 663 N.W.2d 715 (Bablitch, J., concurring).

[5] *See also Willow Creek Ranch, L.L.C. v. Town of Shelby*, 2000 WI 56, ¶¶ 59–172, 235 Wis. 2d 409, 611 N.W.2d 693 (Prosser, J., dissenting) (joined by Justices Bablitch and Crooks).